[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 24, 2003
THOMAS K. KAHN
CLERK

_____

No. 00-15936

_____

EPA No. 00-00006-CAA-2000-04-008

TENNESSEE VALLEY AUTHORITY,

Petitioner,

versus

CHRISTINE TODD WHITMAN, Administrator, United
States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

_____

No. 00-16234

_____

EPA No. 00-00006-CAA-2000-04-008

ALABAMA POWER COMPANY,

Petitioner,

versus

CHRISTINE TODD WHITMAN, Administrator, United
States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

_____

No. 00-16235

_____

EPA No. 00-00006-CAA-2000-04-008

TENNESSEE VALLEY PUBLIC POWER ASSOCIATION,
MEMPHIS LIGHT, GAS & WATER DIVISION, et al.,

Petitioners,

versus

CHRISTINE TODD WHITMAN, Administrator, United
States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

_____

No. 00-16236

_____

EPA No. 00-00006-CAA-2000-04-008

DUKE ENERGY CORPORATION,

Petitioner,

versus

CHRISTINE TODD WHITMAN, Administrator, United
States Environmental Protection Agency,
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondents.

2

Petitions for Review of a Final Order of
the United States Environmental Protection Agency

**(June 24, 2003)**

Before TJOFLAT, BARKETT and WILSON, Circuit Judges.

TJOFLAT, Circuit Judge:

The Environmental Protection Agency ("EPA") concluded that the Tennessee Valley Authority ("TVA") violated the Clean Air Act ("CAA")[1] when it undertook fourteen rehabilitation projects at nine coal-fired electric power plants without permits. The EPA then issued an administrative compliance order ("ACO"), which required that TVA undertake several costly and burdensome compliance initiatives. TVA contended that the EPA had an incorrect understanding of the law and facts, and it therefore refused to comply with the terms of the ACO. Believing that TVA could not be sued in federal court,[2] the EPA created a scheme in which the Environmental Appeals Board ("EAB") was delegated the task of "reconsidering" the ACO by informally adjudicating the issue of liability. After the EAB decided that TVA did, in fact, violate the CAA

---

[1]The Clean Air Act is codified at 42 U.S.C. §§ 7401-7671q.

[2]The EPA concedes that it normally must prove a CAA violation in a federal district court if a party disputes an ACO: "In most instances if a party disputes . . . the order, EPA can choose to bring a judicial enforcement action." Second Brief of Respondents at 9.

3

when it undertook the rehabilitation projects without permits, TVA filed a petition for review in this court, asking us to set aside the EAB Order as unlawful and the product of "arbitrary and capricious" decisionmaking pursuant to the Administrative Procedure Act's ("APA") judicial review provision, 5 U.S.C. § 706(2)(A).

We hold that we lack jurisdiction to review the ACO because it does not constitute "final" agency action. Although the CAA empowers the EPA Administrator to issue ACOs that have the status of law,[3] we believe that the statutory scheme is unconstitutional to the extent that severe civil and criminal penalties can be imposed for noncompliance with the terms of an ACO. Accordingly, ACOs are legally inconsequential and do not constitute final agency action. We therefore decline to assert jurisdiction over TVA's petition for review pursuant to 42 U.S.C. § 7607(b)(1).[4] The EPA must prove the existence of a CAA violation in district court; until then, TVA is free to ignore the ACO without risking the imposition of penalties for noncompliance with its terms.

---

[3]When we use the phrase "status of law," we are referring to a legal instrument, such as an injunction, that, if violated, leads to the imposition of civil and/or criminal punishment. Thus, if noncompliance with the terms of an ACO can be the sole basis for the imposition of severe fines and imprisonment, then an ACO has the status of law.

[4]Section 7607(b)(1) provides for appellate review of "any other final action of the Administrator under this chapter."

This opinion consists of six parts. In part I, we describe the CAA's enforcement scheme. An important component of this discussion is the following observation: Congress clearly intended that ACOs be issued without any sort of adjudication, and the EPA has always (until now) abided by this obvious interpretation. This part also describes the course of this litigation, detailing the EPA's decision to conduct an adjudication prior to the issuance of the ACO – an adjudication that employed procedural rules that were invented by the EAB and administrative law judge ("ALJ") and applied on an ad hoc basis. Part II provides an overview of the Supreme Court's finality doctrine. This part concludes by focusing the discussion on one essential finality factor: whether the agency's action fixes a legal right or obligation. Although we ultimately believe that the CAA clothes ACOs with the status of law, part III explains why this conclusion is not axiomatic, notwithstanding the plain language of the statute. Several factors that might inform our interpretation of the CAA – agency practice, legislative history, the canon of statutory construction which requires courts to interpret statutes in a way that renders them constitutional, the problem of judicial review, and statutory structure – all point to the conclusion that Congress did not intend that ACOs have the status of law. Part IV explains how the plain language of the CAA leads to the unavoidable conclusion that Congress did, in fact, authorize the

5

issuance of ACOs with the status of law.  In this vein, the tension between parts III and IV reveals that the CAA was poorly drafted.  Part V explains why the CAA is unconstitutional to the extent that monetary penalties and imprisonment can be imposed merely for noncompliance with an ACO.  This part also explains why the statute cannot be saved by a voluntary pre-ACO adjudication.  Part VI, the conclusion, makes the following point: since a deprivation of liberty or property cannot stem from mere noncompliance with an ACO, ACOs have no legal consequence and therefore do not constitute final agency action.  Not only is this result constitutionally compelled; it also enables future courts to sidestep the thorny problems presented by part III, such as the fact that ACOs are typically issued without a record and the fact that an EPA adjudication of liability conflicts with other provisions of the statutory scheme.

## I.  Background

### A.  The Statutory Scheme

When the EPA finds that a regulated party is engaging in some sort of unlawful activity – such as emitting pollutants in excess of that allowed by EPA regulations or constructing a pollution source without a permit required by an state implementation plan ("SIP") – the EPA has four enforcement options.  First, the

6

EPA can request that the Attorney General commence a criminal prosecution. See 42 U.S.C. § 7413(a)(3)(D), (c).[5] Second, the EPA can file suit in district court and seek injunctive relief and the imposition of civil fines.[6] See 42 U.S.C. § 7413(a)(1)(C), (a)(2)(C), (a)(3)(C), (b). Third, the EPA can, after a formal adjudication of liability consistent with the APA[7] and 40 C.F.R. § 22,[8] assess civil penalties against the violator. See 42 U.S.C. § 7413(d). Whenever any of these three enforcement methods is used, the following fact remains true: if the defendant believes that the EPA has based its conclusions upon erroneous facts or an incorrect understanding of the law, the defendant may make legal and factual

---

[5]The key statutory provisions that are relevant to this case – section 7413 and section 7477 – can be found in the attached appendix.

[6]When the Administrator decides to file a civil action in district court, the decision to file suit need not be based upon the substantial amount of evidence necessary for victory at trial. Rather, the decision to file suit need only be based upon "any information available." See, e.g., 42 U.S.C. § 7413(a)(1)(C). That is, the decision to file suit need only meet something akin to the "probable cause" standard in criminal law or the standard for avoiding sanctions found in Fed. R. Civ. P. 11. It need not be based upon the more rigorous "substantial evidence" requirement of the APA. See 5 U.S.C. § 706. The same goes for a decision to refer a potential criminal violation to the Attorney General.

[7]See 5 U.S.C. §§ 554, 555.

[8]40 C.F.R. § 22 codifies the EPA's "Consolidated Rules of Practice Governing the Administrative Assessment of Civil Penalties and the Revocation/Termination or Suspension of Permits." Part 22 contains an exhaustive set of procedures governing formal adjudication, including the following: the filing of a complaint, see § 22.14; motion practice, see § 22.16, alternative dispute resolution, see § 22.18, discovery, see § 22.19, the admission of evidence, see § 22.22, findings of fact and conclusions of law by an ALJ, see § 22.21, and appellate review by the EAB, see § 22.29.

arguments in an independent forum – one that enables the defendant to utilize a panoply of pre-established procedural rights.

The EPA also has a fourth option: it can issue an ACO directing the regulated party to comply with various requirements. See 42 U.S.C. § 7413(a)(1)(A), (a)(2)(A), (a)(3)(B), (a)(4). ACOs can be issued so long as the following requirements are met: (a) they must be based upon "any information available to the Administrator"; (b) they must be issued thirty days after the issuance of a Notice of Violation; and (c) the regulated party must be given an "opportunity to confer" with the Administrator. See 42 U.S.C. § 7413(a)(1), (4).

The problem with ACOs stems from their injunction-like legal status coupled with the fact that they are issued without an adjudication or meaningful judicial review. First, ACOs are issued without any sort of adjudication that a party has violated the CAA. Like the decision to pursue a civil enforcement action in district court and the decision to refer a potential criminal violation to the Attorney General, the decision to issue an ACO is made "on the basis of any information available to the Administrator." 42 U.S.C. § 7413(a)(1). That is, the Administrator need only have a staff report, newspaper clipping, anonymous phone tip, or anything else that would constitute "any information." The standard is less rigorous than the probable cause standard required for the issuance of

8

search warrants; certainly no pre-ACO adjudication that a party has violated the CAA (such as by modifying a pollution source in violation of an SIP) is contemplated. This observation is confirmed not only by the language of the statute, but also by agency practice. ACOs are rarely, if ever, issued after an agency adjudication.[9] Finally, section 7413(d) explicitly requires an adjudication before the EPA can assess civil penalties, underscoring the fact that when Congress wants the EPA to conduct an adjudication, it knows how to effectuate that result. In sum, the statute's language and structure, in addition to agency practice, make clear that ACOs are issued without any adjudication.

A second aspect of ACOs is that they have the status of law. The other three enforcement options dovetail with the ACO provisions, making a violation of an ACO a freestanding violation. That is, a violation of an ACO can itself serve as the basis for the imposition of extensive civil fines or imprisonment. Section 7413(b), for example, provides that a civil action can be commenced not only when a person has violated an SIP or EPA regulation, but also after a party fails to comply with an "order." Similarly, section 7413(c)(1) provides that "[a]ny person

---

[9]In this case, for example, *six* ACOs were issued by the EPA without any adjudication whatsoever. The seventh ACO, unlike the first six, was issued after the EPA undertook a proceeding that resembles an adjudication – a step that the EPA concedes was "exceedingly unusual." See First Brief of Respondent at 41.

9

who knowingly violates . . . any order under subsection (a) of [42 U.S.C. § 7413] . . . shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not to exceed 5 years, or both." Criminal liability can also be predicated upon a violation of an ACO issued pursuant to 42 U.S.C. § 7477. Finally, the EPA can administratively assess civil penalties based upon the violation of any "order" issued by the EPA. See 42 U.S.C. § 7413(d). Apparently dissatisfied with the dispensation of justice by the federal courts, Congress empowered the EPA to decide the central question of whether a regulated party has complied with an SIP or EPA regulation. Once the EPA has decided the underlying issue of liability, it can issue an injunction-like order which, upon noncompliance, leads to a host of severe penalties. The following scenarios illustrate the scheme:

> **Scenario One:** *The EPA Administrator reads a newspaper report stating that Energy Co. has modified a power plant without a permit. The EPA also receives an anonymous phone tip "confirming" the report. Based upon the newspaper's discussion of the precise nature of the modifications, the Administrator believes that the modifications are so extensive that Energy Co. is in violation an SIP. That is, the Administrator finds that there has been a violation of an applicable implementation plan based upon "any information available to the Administrator." 42 U.S.C. § 7413(a). The Administrator gives the requisite "Notice of Violation" to Energy Co., and Energy Co. vehemently disagrees with the EPA. It believes that the EPA has based its finding upon an erroneous view of the law and facts, and so it does nothing in response to the Notice of Violation. After 30 days,*

10

*the Administrator issues a highly detailed administrative compliance order pursuant to 42 U.S.C. § 7413(a)(1). The Administrator provides Energy Co. with an "opportunity to confer," see § 7413(a)(4), hoping that she can settle the matter with Energy Co. and thereby avoid the difficult and costly task of proving a violation in court. The Administrator revises the ACO several times, but to no avail; Energy Co. continues to believe that the Administrator's view of the law and facts is wrong. After conducting an investigation so that it can make out a complaint against Energy Co., the EPA takes the following course of action: first, the EPA seeks to administratively assess civil penalties against Energy Co. pursuant to section 7413(c); second, the agency seeks an injunction in district court pursuant to section 7413(b); third, because the EPA believes that Energy Co. is a "knowing violator" of the SIP under section 7413(d), it asks the Attorney General to bring a criminal action against Energy Co. In all three forums – the civil suit seeking an injunction, the intra-agency proceeding seeking civil penalties, and the criminal prosecution seeking imprisonment – Energy Co. is allowed to contest EPA's view of the facts and law. In each case, the original tribunal or a reviewing court might decide that the EPA has failed to prove that Energy Co. has violated an SIP or EPA regulation.*

**Scenario Two:** *Just like Scenario One, the EPA Administrator reads a newspaper report stating that Energy Co. has been undertaking various modifications to a power plant without a permit. She also receives an anonymous phone tip "confirming" the report. Based on the newspaper's discussion of the precise nature of the modifications, the Administrator believes that the modifications are so extensive that Energy Co. is in violation an SIP. That is, the Administrator finds that there has been a violation of an applicable implementation plan based upon "any information available to the Administrator." 42 U.S.C. § 7413(a). The Administrator then gives a "Notice of Violation" to Energy Co. Energy Co., believing that the EPA has based its finding upon an erroneous view of the law and facts, does nothing in response to the Notice of Violation. The Administrator*

11

*responds by issuing a highly detailed administrative compliance order pursuant to 42 U.S.C. § 7413(a)(1).*

*At this point, the story begins to change dramatically from Scenario One. The Administrator provides Energy Co. with an "opportunity to confer," see 42 § 7413(a)(4), although the "opportunity" is really no opportunity at all because the Administrator has no intention of changing the ACO. After a few weeks, Energy Co. still has not complied with the terms of the ACO, because Energy Co. continues to believe that the Administrator has an incorrect understanding of the law and facts. The EPA responds by filing an action for the assessment of civil fines pursuant to section 7413(d), in addition to referring the matter to the Attorney General for prosecution. The only issue in each proceeding is whether Energy Co. did, in fact, violate the terms of the ACO. Energy Co. does not have a chance to contend that the EPA has an incorrect view of the facts and law; these issues are irrelevant. Each proceeding involves a brief hearing, with the EPA proffering irrefutable evidence that (a) an ACO was properly issued by the Administrator based upon "any information" available to her (i.e., the newspaper article and anonymous phone tip) and (b) Energy Co. refused to comply with the ACO. Energy Co. is subsequently fined $25,000 per day, and the CEO of Energy Co. is hauled off to prison for five years.*

In short, because an ACO can be issued "on the basis of any information available" to the Administrator, and because noncompliance with an ACO automatically triggers civil and criminal penalties, Energy Co. and its corporate officers never get an opportunity to argue, before a neutral tribunal, that the modifications in question do not violate an SIP. The EPA is the ultimate arbiter of guilt or innocence, and the courts are relegated to a forum that conducts a proceeding, akin to a show-cause hearing, on the issue of whether an EPA order

12

has been flouted. As will be discussed *infra*, this scheme violates the Due Process

Clause and the separation-of-powers principle. Our task for the moment is merely

to describe how the scheme works.

### B. This Litigation

The Tennessee Valley Authority ("TVA"), an agency of the United States,

was established pursuant to the Tennessee Valley Authority Act of 1933, 16

U.S.C. §§ 831–831ee. One of its primary responsibilities is to provide electric

power at reasonable rates. 16 U.S.C. § 831n-4(h). To satisfy the statutory

directive, TVA owns and operates eleven coal-fired electric power plants,[10] most

of which were built between the 1950s and the 1970s.

Beginning in the late 1970s, TVA began to plan a series of projects

involving the replacement of various boiler components[11] at its coal-fired plants,

which were carried out between 1982 and 1996. In 1999, the EPA arrived at the

conclusion that these projects did not constitute "routine maintenance" as provided

---

[10]TVA also operates twenty-nine hydroelectric plants, four gas turbine plants, and one pumped-storage facility.

[11]The boiler in a coal-fired plant typically consists of miles of tubing and piping and has various components. Some of those components are known as horizontal reheaters, economizers, superheaters, furnaces, waterwalls, and cyclones. The boiler generally performs the following two functions: (1) it combusts coal and then releases it as heat and light; and (2) it converts heat energy into steam energy.

13

for in the exception to the "physical change" component of the "modification" definition set forth in the regulations promulgated under the CAA.[12]  Accordingly, the EPA believed that the projects triggered New Source Review ("NSR"),[13] New Source Performance Standards ("NSPS"),[14] and the requirements of various SIPs.

On November 3, 1999, the EPA issued its first ACO,[15] requiring TVA to identify any modifications undertaken without permits, apply for the permits, and enter into a compliance agreement with the EPA.  Between January and May of

---

[12]The CAA provides a reprieve for existing facilities, allowing them to avoid the expense of adding state-of-the-art pollution controls.  However, once plants are "modified" in a manner that significantly increases emissions, the permitting requirements apply and controls must be added. See 42 U.S.C. § 7411(a)(4) (defining "modification" as "any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.").  EPA regulations provide, however, that "[a] physical change in the method of operation shall not include: . . . Routine maintenance, repair, and replacement."  40 C.F.R. § 52.21(b)(2)(iii)(*a*).

[13]In 1977, Congress enacted the NSR program which required states to designate whether discrete areas meet the National Ambient Air Quality Standards ("NAAQS") for each listed pollutant and establish pre-construction permitting requirements for new and modified sources. For areas that meet the NAAQS, permits must, among other things, require installation of the best available control technology for each regulated pollutant.  42 U.S.C. § 7475(a).  New and modified sources in "nonattainment areas" (i.e., areas that fail to meet NAAQS), must, prior to construction, obtain a permit which, among other things, requires the source to achieve the lowest achievable emission rate and to provide enforceable emissions offsets. The EPA has promulgated regulations, see 40 C.F.R. § 51.165, governing the approval of state nonattainment NSR programs.

[14]The NSPS program requires that the EPA issue federal performance standards, based upon the "best demonstrated technology," for categories of new stationary sources that (a) cause air pollution and (b) may reasonably be anticipated to endanger public health or welfare.  42 U.S.C. § 7411(b)(1)(B); 40 C.F.R. § 60.

[15]TVA petitioned this court for review of the November 3, 1999 ACO on May 4, 2000.

14

2000, TVA and the EPA held a series of negotiations, leading to six separate amendments to the ACO. After the EPA issued its sixth amended ACO, TVA held firm to its view of the facts and law – namely, that (a) the "modifications" at issue constituted "routine maintenance" and a permit was therefore not required;[16] (b) no increase in emissions could be traced to the modifications; and (c) the EPA suddenly changed its definition of "modification" to encompass projects undertaken decades ago, thereby violating the fair notice concepts found in the Constitution's Due Process Clause and administrative common law.[17] On May 4, 2000, the EPA informed TVA by letter that it was going to "reconsider" the ACO and directed TVA to comply with the ACO in the meantime. TVA petitioned this court for review of EPA's "notice of reconsideration" on May 12, 2000.

Rather than issuing a seventh amended ACO after staff deliberation, the EPA took a step that it describes as "exceedingly unusual":[18] it decided to "reconsider" the ACO by "adjudicating" the issue of whether TVA had violated

---

[16]Much like replacing a car battery, TVA contends that the alleged "modifications" were acts of "routine maintenance" for the following two reasons: (1) without the modifications the power plants could not operate for their entire useful lives and (2) the modifications comprised only a tiny fraction of the total capital outlay necessary to build and maintain each plant.

[17]For a thorough analysis of TVA's fair notice claim, see Note, Jason Nichols, "Sorry! What the Regulation Really Means is . . . .": Administrative Agencies' Ability to Alter an Existing Regulatory Landscape Through Reinterpretation of Rules, 80 Tex. L. Rev. 951 (2002).

[18]See First Brief of Respondent at 41.

the CAA when it undertook several plant modifications without a permit.[19]  The

Administrator delegated the task of "reconsidering" the ACO to the EAB, which

she was entitled to do by law.  See 40 C.F.R. § 1.25(e) (giving the EAB authority

to exercise any authority delegated to it, including the authority to "serve as the

final decisionmaker, as the Administrator deems appropriate").  Thus, the EAB,

enlisted to serve as a proxy for the Administrator, possessed the Administrator's

authority to issue the EPA's "reconsidered" ACO.

---

[19] Rather than examining whether the ACO was validly issued (i.e., whether the ACO was issued "on the basis of any information"), the EPA sought to examine the issue of liability (i.e., whether TVA committed a violation of the CAA).  "Neither the CAA nor EPA's regulations provides a specific process to . . . adjudicate an administrative order like the ACO," the EPA boldly points out.  See Second Brief of Respondents at 9.  So why did the EPA decide to undertake an adjudication notwithstanding its observation that the statute does not authorize one?  The EPA gives this answer: "In most instances if a recipient disputes or defies the [ACO], the EPA can chose to bring a judicial enforcement action.  That option was not available here because TVA is a sister federal agency, whom EPA cannot sue in court.  Therefore, to address this unique circumstance, on May 4, 2000, then-EPA Administrator Carol Browner delegated to the EAB her authority to craft an appropriate reconsideration procedure, tailored to these unusual circumstances in a manner consistent with analogous agency practice, and further directed the EAB to issue a final decision by September 25, 2000."  See Second Brief of Respondents at 9.  The EPA's answer begs the question. Why didn't the EPA stop with the sixth amended ACO?  Why did it feel obliged to issue a seventh ACO after an "adjudication" that TVA violated the CAA when it undertook various modifications without a permit?  One possibility is that the EPA felt that Executive Order 12146 would require the Attorney General to ultimately decide the dispute, and the Attorney General could perhaps make a better decision based upon some sort of record.  TVA believes that the EPA's motive was more sinister, claiming that the agency simply wanted to spur compliance with its demands while simultaneously thwarting judicial review by undertaking a proceeding that would enable the EPA to allege that since its decisionmaking process had not been completed, any outstanding ACO was not final.  In any event, our first panel decision rejected EPA's contention that TVA could not be a defendant in a judicial enforcement action.  See Tenn. Valley Auth. v. EPA, 278 F.3d 1184 (11th Cir. 2002).  Faced with this holding, one must wonder why the EPA did not thereafter treat this case as a typical dispute by bringing an enforcement action in district court.

16

The EAB crafted a reconsideration procedure which, to say the least, lacked the virtues of most agency adjudications.[20] *First,* the ALJ was instructed by the EAB not to make any findings of facts and conclusions of law.  Adjudications typically have statutory protections guaranteeing the ALJ's independence from the heads of the agencies in which they serve.  See 5 U.S.C. § 7521.  The EAB, by contrast, is a *delegatee* of the Administrator and is located within the Administrator's Office.  See 57 Fed. Reg. 5320, 5320-22 (Mar. 1, 1992).  *Second,* discovery was effectively unavailable:  TVA was not entitled to any compulsory process and therefore had to utilize only those documents that the EPA voluntarily divulged; TVA was not allowed to take several depositions; and the EPA made available its hefty privilege log only after the hearing concluded.  *Third*, the testimony that was allowed at the hearing was again "limited" at the behest of the Administrator.  *Fourth*, the proceeding was rushed, giving TVA little time to prepare its defense.  TVA was given less than eight weeks of advance notice of the hearing, and the basis of EPA's case was not divulged until three weeks before the hearing.  The reasoning behind EPA's finding that TVA's projects caused

---

[20]This assertion comes with a caveat: the EAB proceeding was unfair *to the extent that it embodies an adjudication that TVA committed a violation of the CAA*.  However, ACOs can be based upon "any information available" – a considerably broad standard that requires much less than an adjudication of liability.  Viewed as a search for "any information," the procedural protections granted by the EAB were certainly more than adequate.

emissions increases were not divulged *at all* prior to the hearing. Moreover, TVA was entitled to no more than two weeks to identify witnesses in a regulatory matter spanning over twenty years. TVA was not granted any time extensions to conduct discovery and prepare its case. *Fifth*, the EAB and ALJ manufactured the procedures they employed on the fly, entirely ignoring the concept of the rule of law. Although the EAB said that the EPA's Consolidated Rules of Practice ("CRP"), 40 C.F.R. § 22, could serve as an adjudicatory model, the rules were only to be used for "guidance." See, e.g., In re Tenn. Valley Auth., CAA Docket No. 00-6, at 20 n.11 (Sept. 15, 2000) (hereinafter "EAB Order"). The EAB admonished TVA that the proceeding "is not a formal [40 C.F.R. § 22] proceeding, that TVA is not entitled to discovery, and that the schedule in this proceeding has granted TVA significantly greater discovery and hearing rights than required by CAA § 133(a), 42 U.S.C. § 7413(a)."[21] EAB Order, at 17. The rules were applied on a purely ad hoc basis. For example, under 40 C.F.R. § 22.27(a), the "Presiding Officer" (e.g., an ALJ) is required to render an "initial decision." The ALJ in this case had no such authority. The ALJ also refused to apply CRP in upholding EPA's objections to TVA's document requests.

---

[21]The EAB's position was, of course, accurate. Section 7413 does not create *any* procedural rights precisely because an adjudication is not contemplated by that statute.

Sometimes, the ALJ likened the sixth amended ACO to a "complaint" so as to permit the EPA to supplement the record; other times, the ALJ referred to the ACO as a mere "compliance order" and used this categorization to bar TVA's discovery. Describing the procedural framework being employed, the ALJ said: "There's no question about it. This is an invented . . . ad hoc procedure . . . . It's not described in any rule or regulation or statute . . . and that's the only way to look at it. There is no precedent." Transcript of June 7, 2000 Pre-Hearing Conference at 74-75, R6-99.

The EAB ultimately "affirmed" most of the sixth amended ACO on September 15, 2000. Both during the EAB proceeding and after it concluded, the EPA operated under the mistaken assumption that an ACO issued after an ad hoc "adjudication" could somehow possess a different legal status than an unadjudicated ACO. The EAB, for example, consistently called the product of the EAB decision a "Final Order" while calling all prior ACOs "compliance orders." The EAB also said that "since the Administrator has directed us to reconsider the Compliance Order, we will characterize the Compliance Order's findings as *allegations* that must be proven in order to prevail on reconsideration, and the actions required by the Compliance Order as *requests* for relief." EAB Order, at 5-6. The EAB thus characterized the sixth amended ACO as something akin to a

19

complaint, thereby implying that its final decision, based upon a proceeding that purported to be an agency adjudication, was a different animal. The EPA's brief continues to support the fanciful view that the adjudication conducted by the ALJ and EAB somehow magically transformed the ACO into something else. By way of background (which will be discussed *infra*), the EPA has consistently contended that pre-enforcement review of ACOs is unavailable because ACOs allegedly trigger no legal consequences upon noncompliance with their terms. But an *adjudicated* ACO, the EPA argues, is somehow a different creature: "In stark contrast to the ACO, the EAB Final Order constituted a full and complete adjudication by the EAB of the legal and factual issues. Accordingly, the EPA does not contend that . . . this is the kind of action as to which Congress intended to bar pre-enforcement review." See Second Brief of Respondents, at 1 n.4.

On November 13, 2000, TVA petitioned this court for review of the EAB Order pursuant to 42 U.S.C. § 7607(b), which provides for appellate review of any "final agency action of the Administrator." We bifurcated our review of TVA's petitions for review, dealing first with several threshold issues in our opinion of January 8, 2002. See Tenn. Valley Auth. v. EPA, 278 F.3d 1185 (11th Cir. 2002). We held that the petitions for review of the pre-adjudication ACOs were moot because the EAB Order rendered the first ACOs "of no force and effect." Id. at

20

1191.  We also held that TVA possessed independent litigating authority; that the dispute presented a justiciable case or controversy; that Executive Orders 12146 and 12088 did not preclude jurisdiction;[22] and that various petitioners had standing.  Id. at 1191-1209.  Finally, we held that the EAB Order was a reviewable final order, id. at 1198-99, asserting in a footnote that "we are not persuaded that a compliance order may not be reviewed prior to an enforcement action."  Id. at 1198 n.21.  After further reflection, we no longer believe that the EAB Order constitutes final agency action, and we therefore withdraw the part D of our previous opinion to the extent that it expresses a contrary view.

## II.  Discussion of Finality, Part One: The Law of Finality and Why it Matters

### A.  Appellate Review Provision: Why Finality Matters for Jurisdiction

The CAA provides that judicial review of any final EPA action is available "in the United States Court of Appeals for the appropriate circuit."  42 U.S.C. § 7607(b); Harrison v. PPG Indus., Inc., 446 U.S. 578, 100 S. Ct. 1889, 64 L. Ed. 2d

---

[22]The EPA contended that Executive Order 12088 requires that this dispute be resolved by the Director of the Office of Management and Budget.  The EPA also maintained that Executive Order 12146 requires that the Attorney General resolve this inter-agency dispute.

525 (1980).[23]  Thus, this court has jurisdiction only if the EPA's action constitutes

final agency action.


**B.  Finality Doctrine: An Overview**

The Supreme Court has established five factors for determining finality: (1)

whether the agency action constitutes the agency's definitive position; (2) whether

the action has the status of law or affects the legal rights and obligations of the

parties; (3) whether the action will have an immediate impact on the daily

operations of the regulated party; (4) whether pure questions of law are involved;

and (5) whether pre-enforcement will be efficient.  See FTC v. Standard Oil of

Calif., 449 U.S. 232, 239-43, 101 S. Ct., 488, 493-95, 66 L. Ed. 2d 416 (1980).

The second prong is especially important in this case.  In Standard Oil, the Court

distinguished the regulations at issue in Abbott Labs. v. Gardner, 387 U.S. 136,

149, 87 S. Ct. 1507, 1516, 18 L. Ed. 2d 681 (1967), on the ground that the

regulations had a "direct and immediate . . . effect on the day-to-day business" of

---

[23] The Harrison Court had no occasion to address whether the EPA action at issue in that case was truly final agency action.  Both parties agreed that the agency decision was final.  See Harrison, 446 U.S. at 586, 100 S. Ct. at 1894.  The only question before the Court was whether *all* final EPA actions were appealable.  Without an adversarial presentation of the issue, it is not surprising that the Supreme Court failed to address the legal consequences of the agency action at issue – a factor that the Court held in Bennett v. Spear, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997), to be a mandatory finality requirement.  See part II.B, *infra*.

22

the complaining parties because they had " 'the status of law.' " Standard Oil, 449 U.S. at 239-40, 101 S. Ct. at 493. In this vein, the Court rejected the petitioner's argument that the FTC's actions had legal significance: "Socal does not contend that the issuance of the complaint had any such legal or practical effect, except to impose upon Socal the burden of responding to charges made upon it. Although this burden is certainly substantial, it is different in kind and legal effect from the burdens attending what heretofore has been considered to be final agency action." Id. at 242, 101 S. Ct. at 494. Similarly, in Bennett v. Spear, 520 U.S. 154, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997), which was recently affirmed in Whitman v. American Trucking Ass'ns, Inc., 531 U.S. 457, 121 S. Ct. 903, 149 L. Ed. 2d 1 (2001), the Court explained as follows:

> As a general matter, two conditions must be satisfied for agency action to be "final": First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

Bennett, 520 U.S. at 177-78, 117 S. Ct. at 1168 (citation omitted). The second Standard Oil prong, then, is not merely thrown into a totality-of-the-factors balancing test; it is mandatory. The second Bennett factor – whether the agency action is one in which "rights or obligations have been determined" or from which "legal consequences will flow" – is central to our position that ACOs are not

23

final.[24]

## III. Discussion of Finality, Part Two: Why Congress May Not Have Empowered the EPA to Issue ACOs with the Status of Law

It is entirely possible that Congress wanted the EPA to issue inconsequential, complaint-like instruments rather than ACOs with the status of law. That is, one can make a solid argument that Congress never clothed ACOs with the status of law, and that Congress believed that ACOs would not be subject to judicial review.

### A. Avoiding an Unconstitutional Interpretation

One reason that a court might interpret the CAA in a way that diminishes the legal significance of ACOs is the fact that the statutory scheme dictated by the plain language of the statute is constitutionally repulsive. As part V.B, *infra*, explains, the "status of law" interpretation renders the statute unconstitutional, and courts are loath to infer a congressional intention to enact unconstitutional legislation. See Pub. Citizen v. United States Dep't of Justice, 491 U.S. 440, 465-66, 109 S. Ct. 2558, 2572-75, 105 L. Ed. 2d 377 (1989).

---

[24]Several courts have held that ACOs are not final for reasons that we ultimately find unconvincing. See *infra* part V.A. These courts, which contend that ACOs are merely complaint-like documents that do not fix legal obligations, similarly focus on the second prong of the Bennett test.

**B. Statutory Structure and the Problem of Superfluous Provisions**

To ascertain the true meaning of a statute, courts are often forced to delve into the structure of a statute and the context in which different provisions are written. See, e.g., United States v. Tinoco, 304 F.3d 1088, 1105 (11th Cir. 2002). Using this methodology, it becomes apparent that an interpretation that would give ACOs the status of law renders several statutory provisions useless or absurd.

*1. 42 U.S.C. § 7603*

Perhaps most telling is 42 U.S.C. § 7603, which gives the EPA special "emergency powers." When a pollution source presents an "imminent and substantial endangerment to public health or welfare, or the environment," the EPA may bring suit for appropriate relief. If it is "not practicable to assure prompt protection of public health or welfare" by recourse to a judicial forum, then the EPA may issue an "order" on its own initiative. This order "remains in effect" for, at most, sixty days. To secure a permanent injunction, the EPA must sue in district court. If the order is flouted by the alleged violator, the full panoply of penalties can be imposed, including imprisonment pursuant to 42 U.S.C. § 7413(c)(1).

It is clear from the text of section 7603 that Congress enabled the EPA to issue orders with the status of law, but only in an extremely narrow context. There

must be an emergency rising to the point of an "imminent and substantial endangerment." Moreover, the EPA order attains an injunction-like status only for an extremely short time period; any extension must be made by a federal court based upon proof that the defendant has caused extremely harmful pollution. And in the event of an "imminent and substantial endangerment," the EPA does not have unfettered discretion to enter a short-term, injunction-like order. The agency must first resort to a judicial forum; only if that option proves to be impracticable is the EPA justified in issuing such an order. Finally, the EPA is forced to "consult with appropriate State and local authorities and attempt to confirm the accuracy of the information on which the action proposed to be taken is based."

Congress thus authorized the issuance of EPA orders with the status of law, but only in an extremely narrow setting (public emergency), as a last resort (if suing in federal court is impracticable), for a very limited time (sixty days), and after the EPA confirms its information with state and local authorities. Why would Congress cabin EPA orders in this way if the EPA can always issue an identical order (i.e., an ACO) pursuant to 42 U.S.C. § 7413? After all, section 7413 ACOs are of an infinite duration, and they can be issued without going to court – even if recourse to a judicial forum is not "impracticable." Moreover, section 7413 ACOs can be issued "on the basis of any information" that a violation has been

committed; there is no need to worry about whether the violation constitutes a rare public emergency, and there is no need consult sate and local authorities. In sum, section 7603 evidences a congressional intent to permit the EPA to issue orders with the force of law, but only so long as rigorous requirements are met. Section 7413 apparently erases all of those requirements.

### 2. 42 U.S.C. § 7413

Section 7413(c)(1) states that "any person who knowingly violates any . . . order under [42 U.S.C. § 7413(a)] . . . shall, upon conviction, be punished by a fine pursuant to Title 18, or by imprisonment for not to exceed 5 years, or both." When read literally, this provision mandates that a knowing violation of the terms of an ACO can lead to imprisonment. The question for the district court is not whether the defendant has, in fact, polluted in violation of an SIP. Rather, the issues before the court are simply (a) whether an ACO has been issued and (b) whether the defendant has complied with its terms.[25]

This interpretation is, to say the least, bizarre when one reads the rest of the statute. The other criminal provisions require the Government to prove that a

---

[25]In most cases in which the regulated party believes that the EPA has an incorrect view of the law or facts, the party will freely admit that it failed to comply with the terms of an ACO.

defendant has negligently or knowingly released hazardous pollutants. See 42 U.S.C. § 7413(c)(4), (5). Why would Congress bother with requiring the use of the full panoply of procedural rights found in the Federal Rules of Criminal Procedure when the EPA could simply issue an ACO based upon "any information," and, upon noncompliance with the ACO, obtain a conviction? For that matter, the EPA has a strong incentive to avoid proving a violation of an EPA regulation or SIP in *any* forum – including a civil proceeding in district court or an administrative proceeding before an ALJ. If the EPA issues an ACO, it can always avoid the arduous task of proving the violation in court. The ACO provision appears to be a loophole of the highest order.

Section 7413 also provides that ACOs cannot take effect until the regulated party has had an "opportunity to confer" with the EPA. See 42 U.S.C. § 7413(a)(4). Why did Congress include this language? If ACOs do not have the status of law, then this provision makes sense: ACOs are merely complaint-like devices that are used in an effort to avoid recourse to litigation. They are, in short, the beginning of the bargaining process. See Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885, 890-91 (8th Cir. 1977); Asbestec Const. Serv., Inc. v. EPA, 849 F.2d 765, 769 (2d Cir. 1988). But if noncompliance with an ACO can really trigger civil and criminal penalties, then what incentive does the EPA have to "confer" with the

28

regulated party? If the EPA can issue what is, in effect, an injunction, the EPA would rarely feel compelled to compromise.

## C. Agency Practice

An agency's interpretation of its enabling legislation often deserves deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). The Supreme Court's decision in United States v. Mead Corp., 533 U.S. 218, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001), held that Chevron deference is confined to those instances in which the agency renders its interpretation in the course of a rulemaking proceeding or adjudication. Even so, most courts would not completely ignore an agency's interpretation of its organic statutes – even if that interpretation is advanced in the course of litigation rather than a rulemaking or agency adjudication.

The EPA has long taken the litigating position that ACOs lack the status of law and are therefore not subject to pre-enforcement review. In Solar Turbines Inc. v. Seif, 879 F.2d 1073 (3d Cir. 1989), for example, the EPA argued that the section 7603 compliance order at issue "merely state[d] EPA's position and [is] best

29

analogized to a complaint." Id. at 1079.[26]   The EPA took a similar position in this case when it argued that TVA's first petition for review should be dismissed because ACOs have no legal effect and are thus not final agency actions: "The ACO . . . is in the nature of an administrative 'complaint.' " See EPA's Motion to Dismiss TVA's Petition for Review of the Nov. 1999 and May 2000 ACOs at 24. *And again*: "Courts have consistently held that, because they are not self-executing and instead compel action only upon enforcement by the EPA, compliance orders issued under environmental statutes such as the Clean Air Act and Clean Water Act are not 'final' under the APA." Id. (citations omitted).  *And again*:  ACOs "do not impose legally binding rights or obligations on the part of their recipients" and they are "not considered 'final' for purposes of judicial review . . . ." Id. at 26.  *And again:* "[A]bsent an enforcement action initiated by the EPA and a subsequent court order, the findings and conclusions in an administrative order have no operative effect." Id. at 27.

---

[26]The EPA appears to have conveniently forgotten that noncompliance with section 7603 ACOs can lead to the imposition of criminal penalties. See Solar Turbines, 879 F.2d at 1080.  By contrast, the cover letter that accompanied the ACOs in Solar Turbines stated that "[f]ailure to comply with this Order could subject your firm to civil and criminal liabilities pursuant to the Clean Air Act." Id. at 1080.  See also Andrew I. Davis, Judicial Review of Environmental Compliance Orders, 24 Envtl. L. 189, 218-21 (1994).  Why does the EPA stake out a position in court that differs from the position it takes when it issues an ACO to a regulated party?  One possibility is that the EPA likes to have its cake and eat it too – employing the harsh provisions of the CAA when confronting a potentially recalcitrant party, but hesitant to reveal the legal significance of ACOs in court for fear that the very part of the CAA that makes ACOs so effective will be struck down.

**D. The Problem of Judicial Review**

Had Congress wanted ACOs to have the force of law, it surely would have made them subject to judicial review. And had Congress wanted judicial review of ACOs, it surely would have required the EPA to create a record that would facilitate judicial review. But Congress clearly contemplated that ACOs would be issued without a record, and so there would be no way that a reviewing court could review the decision to issue an ACO. The existence of this fact belies the notion that Congress intended to enact a statute in which ACOs have the force of law.

One might respond to this observation by saying that *this case* does, in fact, have a record, and, in any event, courts are always free to remand for the creation of a record. See Harrison v. PPG Indus., Inc., 446 U.S. 578, 446 S. Ct. 1889, 64 L. Ed. 2d 525 (1980). But this retort misses the point, avoiding an argument based upon likely congressional intent and relying upon the particularities of one bizarre case. The point is this: Congress created a statutory scheme in which ACOs are issued without any sort of adjudication, and, accordingly, the EPA has never (until now) undertaken a proceeding that even marginally resembles an adjudication prior to the issuance of an ACO. Given this fact, did Congress really think that a violation of the terms of an unadjudicated ACO (which are 99.9% of them) could trigger civil and criminal penalties? If Congress intended that ACOs have the force

of law, then Congress surely would have facilitated judicial review. Yet in almost every case, the EPA does *not* go about making a record, and the statute clearly countenances this result. The impossibility of judicial review in this setting demonstrates the unlikelihood that Congress ever believed that noncompliance with the terms of an ACO could trigger civil and criminal penalties.

We also wonder how a court of appeals could remand with instructions that the EPA conduct a pre-ACO adjudication since *the statute clearly does not require that the EPA undertake an adjudication prior to the issuance of an ACO*?[27] Perhaps the court is supposed to issue a statement in its remand order that says the following: "Although the statute says that the EPA need not conduct a pre-ACO adjudication, we think that it should do so." A remand with instructions to adjudicate a dispute would, in effect, constitute an amendment to the statute by judicial fiat.[28]

Finally, we ask this question: assuming, *arguendo*, that (a) ACOs have the status of law and (b) a court can make the EPA conduct a pre-ACO adjudication,

---

[27]And what procedural rules would the EPA employ on remand? After all, the EPA is not statutorily required to conduct an adjudication. Perhaps future courts of appeals will attach, as an appendix to their remand orders, a list of judge-made procedures that the EPA ought to adopt so that the reviewing court can have a record sufficient to conduct meaningful appellate review. These procedures would vary from case to case, of course, depending on the circumstances.

[28]Indeed, the absence of a record is ultimately why Judge Becker concluded in Solar Turbines that section 7477 orders are not final agency actions. See 879 F.2d at 1085 (Becker, J., concurring).

32

*what would be the issue for the court of appeals on review of the pre-ACO adjudication?* Throughout this appeal, the litigants have assumed that EPA's adjudication could be overturned if it proves to be "arbitrary [and] capricious or otherwise not in accordance with the law." See 5 U.S.C. § 706(2)(A). But ACOs are valid so long as (a) the EPA waits the requisite thirty days after a Notice of Violation is issued; (b) the EPA grants an "opportunity to confer" with the Administrator; and (c) the EPA issues an ACO "on the basis of any information available to the Administrator" that a regulated party has violated the CAA. See 42 U.S.C. § 7413(a). The only real inquiry is whether the Administrator possessed "any information" – a standard that is less rigorous than the "probable cause" standard found in the criminal law setting. And it is certainly less rigorous than traditional judicial review of agency adjudications under the APA. Whether the Administrator's facts are too thin to warrant an adjudicated finding that an SIP has, in fact, been violated is irrelevant as far as ACOs are concerned. We therefore take issue with the notion that the courts of appeals are free to remand for an agency adjudication of whether an SIP has been violated when that issue is irrelevant in the ACO context.

**E. Legislative History**

33

The legislative history of the CAA, when read in conjunction with several cases that form the backdrop to that history, supports the notion that Congress did not believe that the issuance of an ACO constitutes final agency action. And since ACOs with the status of law must be final, it seems unlikely that Congress intended that ACOs have the status of law.

Prior to the CAA's enactment in 1970, the bill reported by the Senate Committee on Public Works, S. 4358, 91st Cong. (2d Sess. 1970), contained section 116(a) – a provision that directed the Administrator to issue an abatement order to any person in violation of an SIP not being enforced by the state. The Senate measure also contained language that specifically provided for pre-enforcement judicial review of abatement orders. By the time the measure emerged from the Conference Committee, section 113 of the Act contained no language on the subject of pre-enforcement review. Drawing upon this "silent deletion," the Eighth Circuit held that Congress intended to preclude pre-enforcement review of ACOs. See Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885, 890-91 (8th Cir. 1977).[29] The Eighth Circuit also noted that pre-enforcement judicial review would be "wholly inconsistent with the enforcement mechanism established by Congress"

_____

[29]In Lloyd A. Fry Roofing, the regulated party sought an injunction that would prohibit the EPA from enforcing a Notice of Violation. Although the procedural posture was different from the case at hand, the court's analysis of the CAA's legislative history and policy of favoring nonjudicial resolution of disputes is instructive.

because "[p]re-enforcement review would severely limit the effectiveness of the conference procedure [provided by section 7413(a)(4)] as a means to abate violations of the Act without resort to judicial process." Id. The court rejected the interpretation proffered by the regulated party, because that interpretation would allow the EPA to "easily side-step the possibility of pre-enforcement review by filing suit in the district court without prior issuance of an order . . . ." Id. at 891. In other words, allowing pre-enforcement judicial review would create an enormous incentive for the EPA to head straight to federal court rather than using the alternative dispute resolution mechanism established by Congress. Why issue an ACO when doing so would enable the regulated party to file a petition for review and delay enforcement as long as possible? The EPA would be better off to hide its cards until it brings an enforcement action in federal court.

Other courts similarly concluded that pre-enforcement review is unavailable under the CAA. The Second Circuit, for example, considered a case highly analogous to the case at hand. See Asbestec Constr. Serv., Inc. v. Seif, 849 F.2d 765 (2d Cir. 1988). Looking to the Supreme Court decision in FTC v. Standard Oil Co. of California, 449 U.S. 232, 239-43, 101 S. Ct. 488, 493-95, 66 L. Ed.2d 416 (1980), for guidance, the Second Circuit held that the ACO was not a final agency action. The court conceded that the ACO was a final and definitive statement of

35

the agency's position, but it believed that the other Standard Oil factors weighed against finding that the ACO was a final action. See Asbestec, 849 F.2d at 768. The court focused first on the second Standard Oil factor, which requires the reviewing court to analyze the effect on the petitioner absent review. The Second Circuit rejected Asbestec's claim that it would suffer adverse effects sufficient to deem the agency action final; it was not enough for Asbestec to show that it would be "stigmatized" or suffer "diminished opportunities" absent pre-enforcement review. Id. Relying on precedent, the court stated that "[the word] 'effect' in determining whether an agency's action is final only denotes the imposition of an obligation, the denial of a right, or some other establishment of a legal relationship." Id. (citing Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 112-13, 68 S. Ct. 431, 436-37, 92 L. Ed. 568 (1948), and Abbott Labs. v. Gardner, 387 U.S. 136, 152-53, 87 S. Ct. 1507, 1517-18, 18 L. Ed. 2d 681 (1967)). The court therefore held that "Asbestec's 'stigma' contention . . . is without merit because neither its duties nor its obligations have been altered by the compliance order." Id. at 768-69. The court then turned to the third Standard Oil factor and noted that the issues presented for review were not purely legal. Being mostly factual, "reviewing compliance orders would ordinarily place a significant burden on appellate courts." Id. at 769. The last Standard Oil factor – whether immediate

36

judicial review would foster agency and judicial economy – similarly militated against finding that the compliance order was final. The court asserted that "the EPA must have some degree of free rein to protect the public from [environmental harm]. To introduce the delay of court review of administrative action taken to ameliorate a potential public health hazard would conflict with Congress' aim to 'accelerate . . . the prevention and control of air pollution.' " Id. (quoting 42 U.S.C. § 7401(b)(2)). The court thus concluded that "immediate pre-enforcement review of compliance orders . . . serve[s] neither efficiency nor enforcement of the Clean Air Act." Id.

The Third Circuit also held that pre-enforcement review of ACOs is not available under the CAA. See Solar Turbines Inc. v. EPA, 879 F.2d 1073 (3d Cir. 1989). There, the EPA issued an ACO that "requir[ed] the immediate cessation of construction and/or operation of the gas turbine facility at Caterpillar Tractor." Id. at 1076. The court, approving of the reasoning of the Eighth Circuit and a prior Third Circuit opinion,[30] discussed the policy behind Congress's implicit decision to deny pre-enforcement review:

> A challenge to [an ACO] would intrude on the procedural sequence created by Congress whereby parties receiving notice of noncompliance are first encouraged to resolve their problems with the

---

[30]See West Penn Power Co. v. EPA, 522 F.2d 302 (3d Cir. 1975).

states and with EPA in an informal, less costly manner. Judicial review becomes appropriate when the EPA, failing efforts at negotiation and compromise, takes steps at enforcement subjecting the facility to consequential penalties.

Id. at 1078.

When the 1990 amendments to the CAA were proposed, the Senate supported a bill with a provision exactly the opposite of the bill it supported in 1970. That is, the Senate proposed that the CAA explicitly provide that "orders issued pursuant to section 113(a) [and] section 167 . . . are not 'final' agency actions within the meaning of section 307(b)(1)." S. Rep. 101-228 (Dec. 20, 1989). The Senate Report explained the policy behind the Senate proposal as one of (a) facilitating prompt EPA enforcement and (b) the promotion of judicial economy:

> Any judicial review of administrative orders may be carried out only at the time the government or another person seeks to enforce such orders. Otherwise, enforcement for violations of the Act could be delayed indefinitely pending judicial review of the Federal courts of appeal. [Asbestec, Solar Turbines, Union Electric,[31] and Lloyd A. Roofing] emphasize that this clarification comports with the goals of the Act. EPA must possess the ability to proceed expeditiously against violators. Allowing immediate review of an administrative order in a court of appeals would significantly delay enforcement, and could suspend correction of the underlying violation for years. This is particularly true in cases where a district court defers a decision pending a ruling by the court of appeals. Equally undesirable is the prospect that courts at both the district and court of appeals levels might decide to consider the same issue at the same time. In short,

---

[31]Union Elec. Co. v. EPA, 593 F.2d 299 (8th Cir. 1979).

delays resulting from the pre-enforcement review of administrative orders not only conflict with the statutory directive that air pollution be prevented in an expeditious fashion, but it also hinders the ability to protect the public from the environmental hazards associated with air pollution.

\* \* \*

This amendment will also promote judicial economy. At present, burdens on the Federal appellate courts are significant. Given the fact that many challenges to administrative orders involved factual questions, district court review in an enforcement proceeding is the better forum than is review in the court of appeals.

See S. Rep. 101-228 (Dec. 20, 1989).

Although the Conference Committee ultimately did not adopt the Senate proposal, it is not possible to draw the same inference from the "noisy" deletion in 1990 as one could draw about the "silent" deletion in 1970. By 1990, a legal backdrop had been created by judicial decisions holding that the CAA already precluded pre-enforcement review. Citing Asbestec, Solar Turbines, Union Electric, and Lloyd A. Fry Roofing, the Senate Report noted that "several courts" had already held that pre-enforcement review was foreclosed. For this reason, the Report described the amendment as a provision designed to "clarify" and "confirm" that ACOs were not subject to pre-enforcement review. The Senate sought only to make more clear what had already been established in judicial decisions. In a similar vein, two Senate managers on the Conference Committee for the 1990 CAA amendments explained the reasoning behind the Conference Committee's deletion

39

as follows:

> The conference agreement adopts the House provision. Section 307(b)(1) of the Act grants jurisdiction to the federal circuit courts of appeal to review "final action" of the administrator. The term "final action," however, is defined only by a non-exclusive list of particular kinds of actions. Several courts have specifically considered whether section 307(b)(1) provides for pre-enforcement review of administrative orders. As noted in Sen. Rep. 101-228, at 387, the Second, Third, and Eighth Circuits have already resolved and this issue and, as such, except with respect to judicial review of administrative penalty assessments and orders, there is no opportunity for pre-enforcement review and no new statutory language addressing the issue is necessary.

See Chafee-Baucus Statement of Senate Managers on the House-Senate Conference Agreement, 136 Cong. Rec. 36,085 (1990). Congress thus decided that the pre-1990 version of the CAA already precluded pre-enforcement review, making it unnecessary to "clarify" its intention to preclude pre-enforcement review in the 1990 amendments.

**IV. Discussion of Finality, Part Three: Why the Plain Language of the CAA Does, in Fact, Give ACOs the Status of Law**

We have at our disposal several tools that might guide our interpretation of the CAA: the constitutional avoidance canon, statutory structure, legislative history, agency practice, and the problem of judicial review. Even so, no canon of statutory interpretation can trump the unambiguous language of a statute. As part

40

I.A, *supra*, makes clear, several provisions of the CAA undeniably authorize the imposition of severe civil and criminal penalties based solely upon noncompliance with an ACO.[32]  Although the Supreme Court has never addressed the precise meaning of 42 U.S.C. § 7413, it described the scheme as follows:

> The 1970 amendments also specified certain enforcement mechanisms. The Act empowered EPA to order compliance with an applicable implementation plan, § 113(a), 42 U.S.C. § 7413(a) (1982 ed.), and to seek injunctive relief against a source violating the plan or an EPA order, § 113(b), as amended, 42 U.S.C. § 7413(b) (1982 ed.).  In addition, Congress prescribed criminal penalties for knowing violations of plans and orders, § 113(c), 42 U.S.C. § 7413(c) (1982 ed.).

Gen. Motors Corp. v. United States, 496 U.S. 530, 533-34, 110 S. Ct. 2528, 2530, 110 L. Ed. 2d 480 (1990).  Thus, the Court is apparently under the impression that the plain language of the CAA speaks for itself:  noncompliance with an ACO can trigger civil and criminal penalties.

In a similar vein, a leading treatise concludes that "[f]ailure to comply with [an ACO] is [an] independent violation under [the CAA]."  See Law of Environmental Protection § 9.22 (Sheldon M. Novick et al. eds., 2003).  At least

---

[32]The Clean Water Act ("CWA") uses many provisions that are identical to those found in the Clean Air Act.  One provision of the CWA states that the Administrator can issue compliance orders "on the basis of any information available to him."  33 U.S.C. § 1319(a)(1).  Indeed, the entire subsection is entitled "compliance orders."  Subsection (d) of the CWA provides that "any person who violates any order issued by the Administrator under subsection (a) . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation."

one law review article has made a similar assessment. See Andrew I. Davis,

Judicial Review of Environmental Compliance Orders, 24 Envtl. L. 189, 194

(1994) ("Regardless of the merits of the alleged violation underlying the

compliance order, disregarding the order potentially subjects the recipient to

accruing daily penalties. In addition, criminal penalties may be imposed . . . .

Thus, failure to obey a compliance order subjects the recipient to civil, criminal, or

administrative enforcement actions, including penalties of up to $25,000 per day.").

Thus, although there are very good reasons for concluding that Congress did

not mean what it said, the unambiguous language of the CAA, a decision by the

Supreme Court, and scholarly commentary on the subject stand united in their

support of the following proposition: Congress established a scheme in which

noncompliance with an ACO issued "on the basis of any information available" can

lead to the imposition of severe civil penalties and imprisonment – even if the EPA

is incapable of proving an act of illegal pollution in court.

## V. The Unconstitutionality of ACOs That Have the Status of Law

### A. Cases

No court has discussed the constitutional issues inherent in a scheme in

which an executive branch agency can (a) make a finding, on the basis of "any

information available," that the law has been violated and (b) issue a compliance order which, if ignored, leads automatically to the imposition of severe civil penalties and perhaps imprisonment.

The cases that have addressed the issue of whether pre-enforcement review of ACOs is available[33] can be grouped into two categories. The first category consists of those cases in which the courts recognize the fact that ACOs have the status of law but fail to grapple with the constitutional problems that arise from this legal status. These cases include Allsteel, Inc. v. EPA, 25 F.3d 312 (6th Cir. 1994), and Alaska v. EPA, 244 F.3d 748 (9th Cir. 2001) – the only two cases that have, to our knowledge, ever held that judicial review of an EPA order under the CAA or CWA can be had prior to an EPA enforcement proceeding.[34]

---

[33]The vast majority of courts have held that pre-enforcement review of CAA and CWA compliance orders is not available. See, e.g., Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885 (8th Cir. 1977); West Penn Power Co. v. Train, 522 F.2d 302 (3d Cir. 1975); S. Pines Ass'n v. United States, 912 F.2d 713 (4th Cir. 1990); Hoffman Group, Inc. v. EPA, 902 F.2d 567 (7th Cir. 1990); Union Elec. Co. v. EPA, 593 F.2d 299 (8th Cir. 1979); Solar Turbines, Inc. v. Seif, 879 F.2d 1073 (3d Cir. 1989); Asbestec Const. Serv., Inc., v. EPA, 849 F.2d 765 (2d Cir. 1988); Laguna Gatuna, Inc. v. Browner, 58 F.3d 564 (10th Cir. 1995); Child v. United States, 851 F. Supp. 1527 (D. Utah 1994). Courts have typically held that ACOs do not constitute final agency action, and that Congress impliedly precluded pre-enforcement review because such review would undermine Congress's intention to facilitate resolution of disputes through nonjudicial means. See generally, Andrew I. Davis, Judicial Review of Environmental Compliance Orders, 24 Envtl. L. 189 (1994).

[34]It is not surprising that these courts failed to deal with the constitutional issues we raise – especially the due process issue – because no "deprivation" of liberty or property is actually at issue until the Government imposes penalties in a subsequent enforcement proceeding. It might appear, then, that the due process issue is not squarely before the court when it is reviewing an ACO. However, subject matter jurisdiction ultimately hinges upon the validity of an

43

The second category consists of those cases in which courts have underappreciated the legal significance of ACOs. This category can, in turn, be divided into two subgroups. The first subgroup consists of cases in which courts conclude that a regulated party can attack, in a subsequent enforcement proceeding, the legal and factual bases for the EPA's conclusion that a CAA violation has been committed.[35] See, e.g., Lloyd A. Fry Roofing Co. v. EPA, 554 F.2d 885, 891 (8th Cir. 1977) ("[W]e are persuaded by the legislative history of the Clean Air Act Amendments of 1970 to hold that plaintiff lacks authority to initiate and maintain litigation to challenge the EPA's order . . . and that plaintiff must assert its claims as a defense or counterclaim in any action brought by the Administrator of EPA under section 113 of the Clean Air Act."); Child v. United States, 851 F. Supp. 1527, 1536 (D. Utah 1994) ("[I]n the event of any actual assessment of administrative penalties or a judicial enforcement action under § 309(a), Plaintiffs would have an additional opportunity to challenge the EPA's findings in the district court."). If this view were correct, then the *underlying conduct* that

---

enforcement scheme that gives ACOs the status of law, and the courts have an obligation to assess their subject matter jurisdiction *sua sponte.* See Freytag v. C.I.R., 501 U.S. 868, 896, 111 S. Ct. 2631, 2648, 115 L. Ed. 2d 764 (1991).

[35]Although this view is understandable in light of the Constitution's requirement of due process and the separation-of-powers principle, there is no statutory authority for such an interpretation.

triggered the issuance of the ACO would be the ultimate basis for liability, not noncompliance with the ACO. The ACO would fix no legal obligation whatsoever. Any judicial manipulation of the statute that would permit, in the context of an EPA enforcement suit alleging a violation of an ACO, an inquiry into the underlying violation – i.e., whether the alleged polluter actually undertook a "modification" without a permit or otherwise violated an SIP or EPA regulation – would have the effect of making the ACO nonfinal.[36] Only if noncompliance with the terms of an ACO amounts to an independent violation of the CAA (thus triggering civil penalties and criminal sanctions) can an ACO be said to have a "legal consequence." And only then can an ACO be considered final. It is not surprising that no court in this subgroup has found that ACOs constitute final agency action.

The second subcategory consists of those cases in which courts read out the penalty provisions of the statutory scheme. In Solar Turbines, Inc. v. Seif, 879 F.2d 1073, 1081 (3d Cir. 1989), the court held that "[t]he plain language of the statute does not identify any adverse consequences from violating a section 167

---

[36]One treatise contends that courts were wrong to hold that ACOs are not final agency actions. The authors debunk the faulty premise that "[i]f EPA does proceed to court, the order can be challenged at that time." Law of Environmental Protection § 9:22, at 9-100 (Sheldon M. Novick et al. eds., 2003). Rather, the authors point out that "[f]ailure to comply with such an order is [an] independent violation under many of the statutes," including the CAA. Id.

administrative order." However, as several commentators have observed, 42 U.S.C. § 7413(c)(1) provides that a violation of an order issued pursuant to CAA § 167, 42 U.S.C. § 7477, is a crime. See Law of Environmental Protection § 9.22 (Sheldon M. Novick et al. eds., 2003); Andrew I. Davis, Judicial Review of Environmental Compliance Orders, 24 Envtl. L. 189, 220 (1994). This faulty premise enabled the Third Circuit to conclude that the ACO was merely a complaint-like instrument with no legal significance. Solar Tribunes, 879 F.2d at 1081.[37] The court in Asbestec Construction Services, Inc. v. EPA, 849 F.2d 765 (2d Cir. 1988), similarly concluded that the regulated party failed to show that "its duties [or] obligations have been altered by the compliance order." Id. at 769. Finally, the court in Southern Pines Associates v. United States, 912 F.2d 713 (4th Cir. 1990), held that the ACO issued pursuant to the CWA was nonfinal. The court based its conclusion not simply on the fact that the CWA was modeled after the CAA and therefore "Congress meant to preclude judicial review of compliance orders under the CWA just as it meant to preclude pre-enforcement review under the CAA and CERCLA." Id. at 716. Rather, the court also held a misguided understanding of the legal status of ACOs: "Because the compliance order does not

---

[37]At least one law review article echos this incorrect view. See Note, The Clean Air Act Amendments of 1990: Permits and Enforcement–The Guts of the New Law, 18 U. Dayton L. Rev. 275, 305 (1992) ("[T]he function of the compliance order is to put the source on notice that other action may be taken if compliance is not achieved quickly.").

alter [the regulated parties'] obligations under the Act, and EPA can bring a suit whether or not it issues an order, [the regulated parties] are not faced with any greater threat from EPA just because EPA seeks to negotiate a solution rather than to institute civil proceedings immediately." Id. at 716 n.3.

## B. Constitutional Violations

The statutory scheme established by Congress – in which the head of an executive branch agency has the power to issue an order that has the status of law after finding, "on the basis of any information available," that a CAA violation has been committed – is repugnant to the Due Process Clause of the Fifth Amendment.[38]  Before the Government can impose severe civil and criminal penalties, the defendant is entitled to a full and fair hearing before an impartial tribunal "at a meaningful time and in a meaningful manner." Armstrong v. Manzo, 380 U.S. 545, 552, 85 S. Ct. 1187, 1191, 14 L. Ed. 2d 62 (1965).  As shown in Scenario One, see *supra* part I.A, the scheme enacted by Congress deprives the

---

[38]We decline to assess the constitutionality of the provision found in 42 U.S.C. § 7603, which empowers the EPA to issue a compliance order with the status of law, because that provision is not before us.  Section 7603, which applies only in emergency situations and sharply limits the time period in which ACOs have injunction-like status, is certainly less offensive to the Constitution than the scheme established by 42 U.S.C. § 7413.

regulated party of a "reasonable opportunity to be heard and present evidence"[39] on the two most crucial issues: (a) whether the conduct underlying the issuance of the ACO actually took place and (b) whether the alleged conduct amounts to a CAA violation.

Confronted with this patent violation of the Due Process Clause, the EPA might be inclined to respond that it can always "save" the statute by voluntarily undertaking an adjudication prior to the issuance of an ACO. This is a fallacious argument, because the statute clearly establishes a scheme in which the decision to issue an ACO, like the decision to file a civil suit in district court, is made not after a full-blown adjudication of whether a CAA violation has been committed, but rather on the "basis of any information available to the Administrator." This is not an area in which the organic statute has set a vague standard, and there is simply no room for administrative discretion on this point. The EPA cannot, in short, amend the statute.

Far from rendering the statutory scheme more palatable, a pre-ACO adjudication would only highlight another constitutional problem with the CAA: the statutory scheme unconstitutionally delegates judicial power to a non-Article III tribunal. See N. Pipeline Const. Co. v. Marathon Pipeline Co., 458 U.S. 50, 102 S.

---

[39]Yakus v. United States, 321 U.S. 414, 433, 64 S. Ct. 660, 671, 88 L. Ed. 834 (1944).

Ct. 2858, 73 L. Ed. 2d 598 (1982). The statutory scheme relegates Article III courts to insignificant tribunals. The district courts serve as forums for the EPA to conduct show-cause hearings.[40] And the courts of appeals are similarly emasculated, reviewing only whether the ACO has been validly issued – i.e., whether the Administrator based her decision to issue the ACO based upon "any information" as opposed to no information at all.[41] Without meaningful judicial review, the scheme works an unconstitutional delegation of judicial power. See Crowell v. Benson, 285 U.S. 22, 55-60, 52 S. Ct. 285, 293-97, 76 L. Ed. 598 (1932) (upholding the plenary power of an administrative agency to adjudicate certain questions of fact because significant Article III review of legal and factual issues was preserved); Northern Pipeline, 458 U.S. at 85, 102 S. Ct. at 2879 (holding that Article III review of the bankruptcy court under the "clearly erroneous" standard was not rigorous enough to save the statute); id. at 70 n.23, 102 S. Ct. at 2871 n.23 (noting that "[even] when Congress assigns ['public rights'] matters to administrative agencies, or to

[40]The regulated party is, in essence, forced to show cause why it should not be imprisoned or subjected to civil penalties for violating the EPA's order.

[41]If a court of appeals were confronted with two ACOs – the first issued after a formal adjudication that the regulated party committed a CAA violation and the second issued after the Administrator obtained "any information" such as a newspaper clipping or anonymous phone tip – the court of appeals would be forced to deny each petition for review and hold that each ACO had been validly issued. With regard to the first ACO, the court of appeals would be forced to stop its analysis after finding that the "any information" standard had been met; any further inquiry into whether the EPA had "substantial evidence" of a CAA violation would be unnecessary and unauthorized.

legislative courts, it has generally provided, and we have suggested it may be required to provide, for Article III judicial review"); id. at 91, 102 S. Ct. at 2882 (Rehnquist, J., concurring) (agreeing with the plurality that the scope of judicial review established by the statute was insufficient to save the statute); id. at 115, 102 S. Ct. at 2894 (White, J., dissenting) (opining that appellate review "will go a long way toward insuring a proper separation of powers"); Commodity Futures Trading Comm'n v. Schor, 478 U.S. 833, 853, 106 S. Ct. 3245, 3258, 92 L. Ed. 2d 675 (1986) (upholding a CFTC adjudicatory scheme after noting that Congress permitted meaningful judicial review); see also Richard H. Fallon, Of Legislative Courts, Administrative Agencies, and Article III, 101 Harv. L. Rev. 916 (1988) (concluding that meaningful judicial review in an Article III court is a necessary and sufficient requirement under the Constitution); Richard B. Saphire & Michael E. Solimine, Shoring Up Article III: Legislative Court Doctrine in the Post CFTC v. Schor Era, 68 B.U. L. Rev. 85 (1988) (asserting that judicial review by an Article III court is a necessary but insufficient requirement of any delegation of judicial power).

## VI. Conclusion

The Clean Air Act is unconstitutional to the extent that mere noncompliance

with the terms of an ACO can be the sole basis for the imposition of severe civil and criminal penalties. Therefore, ACOs lack finality because they do not meet prong two of the Bennett test. We thus conclude that courts of appeals lack jurisdiction to review the validity of ACOs. The EPA must do what it believes it has been required to do all along – namely, prove the existence of a CAA violation in district court, including the alleged violation that spurred the EPA to issue the ACO in this case.

PETITIONS DISMISSED.

BARKETT, Circuit Judge, specially concurring, in which WILSON, Circuit Judge, joins:

Upon reconsideration, I agree with Judge Tjoflat that this court does not have jurisdiction to review the EAB's order and that, to enforce its determination that TVA has violated the Clean Air Act, 42 U.S.C. § 7401 et seq., the appropriate procedure is for the EPA to file an original action in the district court, just as it does in most other instances in which it has determined that a violation has occurred. See 42 U.S.C. § 7413(b) (describing civil judicial enforcement); see also Second Brief of Respondents at 9 (explaining the EPA's normal course of action for enforcing a compliance order).

As Judge Tjoflat notes, 42 U.S.C. §§ 7413(a)(1), (3) and (5) each provide that the Administrator can conclude that there has been a violation of the requirements or prohibitions of the Clean Air Act "on the basis of any information." Id.; see also 42 U.S.C. § 7413(a)(2) (omitting the word "any" from comparable language in the provision concerning "State failure to enforce SIP or permit program"). Having concluded "on the basis of any information" that a violation has occurred, the Administrator can either:

(1) issue an order requiring compliance with the requirements or prohibitions at issue, 42 U.S.C. §§ 7413(a)(1)(A), (a)(2)(C) and (a)(3)(B), or prohibiting construction or modification, § 7413(a)(5)(A);

52

(2) obtain an administrative penalty order by following the hearing procedures of the Administrative Procedure Act, 5 U.S.C. § 554 and 556, see 42 U.S.C. §§ 7413(a)(1)(B), (a)(2)(B), (a)(3)(A), (a)(5)(B), and (d);

(3) bring a civil action in district court for injunctive relief and fines, §§ 7413(a)(1)(C), (a)(2)(C), (a)(3)(C), (a)(5)(C), and (b); and/or

(4) request that the Attorney General commence a criminal action, § 7413(a)(3)(D).

Under the statutory scheme, the first option for federal enforcement – issuing an administrative order, like the EAB's order before us – can be pursued based on "any information available," without giving the alleged violator an opportunity to challenge the information upon which the order of compliance is based. Although an alleged violator can "challenge" the Administrator's conclusion by conferring with him/her, the statute does not require that the Administrator consider any such arguments or evidence brought to his/her attention beyond that of a good faith effort to comply. See 42 U.S.C. § 7413(a)(4). Thereafter, the statutory scheme provides that penalties, either civil or criminal, can be assessed based only upon a showing

53

that the terms of the order to comply were violated.  See 42 U.S.C. § 7413(b)(2)

(empowering the Administrator to commence a civil action for penalties against an

alleged violator "whenever such person has violated, or is in violation of, ... a

requirement or prohibition of any ... order ... issued ... under this chapter); §

7413(c)(1) (subjecting any person convicted of "knowingly violating ... any order

under subsection (a) of [§ 7413]" to criminal fines and/or imprisonment).  This

scheme must be deemed violative of the due process protections of our Constitution.

Although the Administrator in this case attempted to fill the gap in the statute

and provide some process to TVA,[1] it cannot be deemed sufficient because

constitutional due process cannot be provided on an ad hoc basis under the direction

and control of the entity whose decision is being challenged.[2]  The appropriate

course of action, as noted by Judge Tjoflat, would have been for the EPA to file an

action in federal district court pursuant to 42 U.S.C. § 7413(b) as it does in cases

involving private energy companies.  I recognize that the EPA believed that it could

---

[1]After conferring with TVA and amending the initial compliance order several times, the EPA crafted a reconsideration procedure during which (1) the parties engaged in pre-hearing discovery over two months and (2) an administrative law judge (ALJ) presided over a multi-day evidentiary hearing where each party presented and cross-examined witnesses.  The ALJ then prepared and transmitted the entire record to the EAB for its consideration.

[2]To avoid this due process violation, we conclude that no penalties or other adverse consequences could flow directly from administrative compliance orders.  Thus, we can have no jurisdiction over the order before us under 42 U.S.C. § 7607(b)(1) because it lacks the legal consequences required under FTC v. Standard Oil of Calif., 449 U.S. 232, 239-43 (1980), to make it a final agency action.

not have pursued this course of action against another government agency for the multitude of reasons presented and rejected in our earlier opinion in this case. However, as we have now laid all these concerns to rest, the EPA should treat TVA as it does any private energy company for enforcement purposes. Thus, the EPA's present recourse is to file an original action in federal district court to enforce its order that a violation has occurred.