*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

D. SREEDHARAN NAIR,

　　　　　　　*Plaintiff-Appellant,*

　　　*v.*

OAKLAND COUNTY COMMUNITY MENTAL HEALTH
AUTHORITY and WILLIAM J. ALLEN,

　　　　　　　*Defendants-Appellees.*

No. 05-1177

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-71590—Avern Cohn, District Judge.

Argued: January 26, 2006

Decided and Filed: April 4, 2006

Before: GUY, SUTTON, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Barry S. Fagan, DIB, FAGAN & BRAULT, Royal Oak, Michigan, for Appellant.
Eileen K. Husband, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, for
Appellees. **ON BRIEF:** Barry S. Fagan, DIB, FAGAN & BRAULT, Royal Oak, Michigan, for
Appellant. Eileen K. Husband, Thomas J. Laginess, CUMMINGS, McCLOREY, DAVIS & ACHO,
Livonia, Michigan, for Appellees.

---

## OPINION

---

　　　SUTTON, Circuit Judge. Dr. Sreedharan Nair challenges the district court's entry of
summary judgment against him in this lawsuit claiming (1) First Amendment retaliation under
42 U.S.C. § 1983 and (2) a violation of Michigan's whistleblower statute. Because Nair's speech
did not touch on a matter of public concern, we reject his First Amendment claim, and because his
speech did not threaten to report a violation of law, we reject his state-law claim. And because the
defendants have raised a sovereign-immunity defense to these claims as an alternative ground for
affirmance, we need not decide whether their sovereign-immunity defense otherwise restricts our
authority to reach the merits of this case. We affirm.

1

I.

The Oakland County Community Mental Health Authority "provide[s] a comprehensive array of mental health services appropriate to . . . individuals who are located within its geographic service area, regardless of an individual's ability to pay." Mich. Comp. Laws § 330.1206(1). A county-appointed board oversees the Authority, *id*. § 330.1212, and the executive director has day-to-day control over the Authority, *id*. § 330.1230.

The executive director "function[s] as the chief executive" of the program. *Id*. In "supervising all employees," *id*., the executive director has authority to appoint a psychiatrist as "medical director" to "advise the executive director on medical policy and treatment issues," *id*. § 330.1231.

In 2000, the Authority restructured its organization, which among other things entailed out-sourcing its patient-care responsibilities. By October 1, 2000, the Authority had completed the restructuring so that private contractors provided all patient care.

In November 2000, the Authority elevated Dr. Nair from a position as the interim medical director, which he had held since January 2000, to that of the permanent medical director. And in November 2001, the Authority hired William Allen as its executive director.

In early 2002, to trim administrative expenses, Allen proposed reducing the medical-director position, which was paid $110 per hour, from full-time to half-time. Nair disagreed with the proposal, believing that it would "further erode the role of the Medical Director to the detriment of the agency." JA 293. He sent Allen e-mails, faxes and other documents to convince him the position required full-time hours. Notwithstanding Nair's objections, the reduction took effect in June 2002.

One month later, Nair raised the issue with a pre-accreditation survey team, which displeased Allen. In October, Allen reviewed Nair's performance. While "[o]verall, Dr. Nair's performance ha[d] met the conditions of his position," JA 145, Allen found that "more effort was needed in terms of providing assertive medical leadership," JA 148.

On November 8, 2002, still bothered by the reduction in his hours, Nair sent a letter to the board outlining his concerns about his diminished responsibilities. "[S]teadily and deliberately," he complained, "the responsibilities of the Medical Director have been curtailed and recently the position has been downgraded to halftime level." JA 380. Nair requested that the board "set up a committee to study the role of the Medical Director in an agency like this." *Id*. The letter concluded by asking the board to "consider this matter urgent" and "have a response as soon as possible, as I have serious concerns about my legal, ethical and moral obligations." JA 381.

Allen viewed the letter as an insubordinate act on Nair's part and informed him on November 19 that "this will have serious consequences to it." JA 280, 465. "[A]ny future efforts to go to the Board before addressing issues with me," Allen noted, "will not be tolerated." JA 280. On November 20, Allen sent Nair a memo stating, "I continue to be concerned about [your] lack of leadership with regard to medical director responsibilities and your constant concern about being re-assigned to half-time rather than assertively handling your responsibilities." JA 165.

On November 30, Clifford Johnson, the chairman of the board, responded to Nair's letter. Johnson pointed out that the elimination of the Authority's "direct care" responsibilities had "necessarily altered the function of [the] Medical Director." JA 384. He also noted that the medical director "is selected and hired by, and supervised by, the Executive Director." JA 385. As "a direct subordinate" without patient-care duties, Nair's sole purpose was to add his "professional expertise

and perspective to the overall management effort." *Id*. Johnson thus saw "no legitimate basis for the board action you request." *Id*.

On February 4, 2003, Allen terminated Nair, telling him that "[i]t just wasn't working out." JA 212. In response, Nair filed a complaint in federal court against the Authority and Allen, alleging that they had terminated him in retaliation for exercising his First Amendment rights and in violation of Michigan's Whistleblowers' Protection Act. Claiming that it was an arm of the State because it received over 55% of its budget from the State and because state money ultimately would be used to satisfy any judgment against it, the Authority claimed that the Eleventh Amendment barred the lawsuit from being heard in federal court.

The district court granted the defendants' motion for summary judgment. In doing so, it did not address the Authority's sovereign-immunity defense but instead ruled (1) that because Nair's speech did not touch on a matter of public concern, it could not form the basis of a First Amendment retaliation claim, and (2) that because Nair was not attempting to report a hidden violation of law, he could not bring a claim under Michigan's whistleblower statute.

II.

While the Authority has raised a sovereign-immunity defense to this lawsuit, it has not urged us to address the defense at the outset and indeed has presented the defense as an alternative ground for affirmance. This litigation stance prompts us to consider a jurisdictional question that the parties have not argued or identified: Is a sovereign-immunity defense more akin to an absence of subject-matter jurisdiction, which must be addressed at the outset and which may not be affected by the parties' litigation conduct, or more akin to other affirmative defenses, which need not be addressed at the outset and which a defendant may waive?

From one vantage point, the defense looks like a contention that subject-matter jurisdiction is missing. While the Tenth Amendment does not speak in subject-matter-jurisdictional terms, *see Alden v. Maine*, 527 U.S. 706, 712–14 (1999) (noting that a State's sovereign immunity arises under the Tenth and Eleventh Amendments), and while the United States' sovereign immunity is not described in the Constitution at all, *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 388 (1939), the Eleventh Amendment speaks in classic jurisdictional terms. "The Judicial power of the United States," it says, "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Except for capitalizing "Power" rather than "judicial," the Article III description of judicial authority and of limitations on that authority is strikingly similar to the Eleventh Amendment's. In section one of Article III, the Constitution creates "[t]he judicial Power of the United States," and in section two it describes the subject-matter jurisdiction of the federal courts, namely that "[t]he judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . ." In addition to this similarity in language, there are other parallels between the two jurisdictional limitations. Like subject-matter jurisdiction, a sovereign-immunity defense may be asserted for the first time on appeal, *Edelman v. Jordan*, 415 U.S. 651, 678 (1974), and it may (and should) be raised by federal courts on their own initiative, *Wisc. Dep't of Corr. v. Schacht*, 524 U.S. 381, 389 (1998).

But "[w]hile the Eleventh Amendment is jurisdictional in the sense that it is a limitation on the federal court's judicial power," the defense "is not coextensive with the limitations on judicial power in Article III." *Calderon v. Ashmus*, 523 U.S. 740, 745 n.2 (1998). Unlike subject-matter jurisdiction, a State may waive Eleventh Amendment immunity through its own conduct: by legislation, *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990); by removing an action to federal court, *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002); or by "appearing without objection and defending on the merits," *Ku v. Tennessee*, 322 F.3d 431,

435 (6th Cir. 2003); *cf. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxite de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant."). Unlike subject-matter jurisdiction, federal courts have no obligation to raise an Eleventh Amendment issue on their own, even though they may do so if they wish. *Schacht*, 524 U.S. at 389 ("Nor need a court raise [an Eleventh Amendment] defect on its own. Unless the State raises the matter, a court can ignore it."); *cf. Ins. Corp. of Ireland*, 456 U.S. at 702 ("[A] court, including an appellate court, will raise lack of subject-matter jurisdiction on its own motion."). And unlike subject-matter jurisdiction, "the entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 963 (6th Cir. 2002); *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998) ("[T]he party invoking federal jurisdiction bears the burden of establishing its existence.").

We have not spoken with one voice on whether we must, or whether we may, resolve a sovereign-immunity defense before addressing the merits. The most thorough discussion of the issue appears in *Wilson-Jones v. Caviness*, 99 F.3d 203, 206 (6th Cir. 1997), which reasoned that "state immunity is jurisdictional in the same sense as the complete diversity requirement or the well-pleaded complaint rule" and concluded that a sovereign-immunity defense had to be addressed before the merits. But *Wilson-Jones* was decided before *Schacht*, which held that federal courts need not raise a sovereign-immunity defense on their own initiative, and was decided before *Lapides*, which held that a State's voluntary removal of a case from state court waives the defense. In view of these intervening Supreme Court decisions, we have said that *Wilson-Caviness* "is no longer good law" when it comes to its statement that sovereign immunity is jurisdictional "in the same sense" as subject-matter jurisdiction. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 816 (6th Cir. 2000). *Kovacevich*, however, proceeded to address the jurisdictional issue first and did not explain a court's obligation in this area, even if (as the court concluded) sovereign immunity does not parallel subject-matter jurisdiction.

Both before and after *Kovacevich*, we have issued several opinions saying that we must address the sovereign-immunity issue first. *See, e.g.*, *Angel v. Kentucky*, 314 F.3d 262, 265 (6th Cir. 2002) ("We must therefore address the jurisdictional [Eleventh Amendment] question that clearly exists, even though it was not addressed by the court below."); *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002) (stating that "jurisdictional issues," including an Eleventh Amendment defense, must "be addressed prior to reaching the merits"); *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482, 489 (6th Cir. 2002) ("As a threshold matter, we must determine whether the Treasurer and the Administrator are entitled to Eleventh Amendment immunity."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 570 (6th Cir. 2000) ("We first address Defendants' Eleventh Amendment immunity defense because this defense raises a question of federal jurisdiction."); *Wells v. Brown*, 891 F.2d 591, 592–93 (6th Cir. 1989) ("We are required to decide [the Eleventh Amendment] issue before we decide the merits."); *Childs v. Koosed*, No. 90-3449, 1991 WL 33133, at *4 (6th Cir. Mar. 13, 1991) ("In view of the District Court's disposition of the claims on eleventh amendment grounds, the District Court was without jurisdiction to make the alternative ruling on the merits."); *see also Haas v. Quest Recovery Servs., Inc.*, 338 F. Supp. 2d 797, 799 (N.D. Ohio 2004) ("Although Ohio couches its Eleventh Amendment argument as an alternative basis for dismissal, the Court addresses jurisdictional arguments first.").

And both before and after *Kovacevich*, we have issued several opinions saying that we need not address the sovereign-immunity issue first. *See, e.g.*, *Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003) (deciding to "[p]ut[] the issue of sovereign immunity to the side" and proceeding to "consider the merits of Alkire's claims"); *Brindley v. Best*, 192 F.3d 525, 531 (6th Cir. 1999) ("[W]e need not decide [whether the Eleventh Amendment bars plaintiff's claims] because the defendants" should prevail on the merits.); *Vandiver v. Hardin County Bd. of Educ.*, 925 F.2d 927, 935 (6th Cir. 1991) ("The parties . . . raise [ ] arguments regarding . . . sovereign immunity for the Commonwealth

of Kentucky. In light of our disposition on the merits, it is unnecessary to address these points."); *Linser v. Ohio Dep't of Mental Health*, No. 99-3887, 2000 WL 1529809, at *1 n.1 (6th Cir. Oct. 6, 2000) ("Given the unsettled nature of the law regarding states' Eleventh Amendment immunity as to Titles I and II of the ADA, we do not address the question of whether Linser's claims . . . are barred by the Eleventh Amendment. Instead we address only the merits of Linser's claims."); *Rowlands v. Pointe Mouille Shooting Club*, No. 98-1514, 1999 WL 520110, at *3 n.3 (6th Cir. July 14, 1999) ("Because [plaintiff's] claim fails on [procedural] grounds, we need not decide the issue of whether the Eleventh Amendment bars a qui tam suit."); *cf. Tri-State Steel Constr. Co. v. Herman*, 164 F.3d 973, 980 (6th Cir. 1999) ("Having concluded that Rule 11 sanctions may not be incorporated into the Commission Rules, we need not decide whether the doctrine of sovereign immunity also precludes an award of Rule 11 sanctions against the United States in proceedings before the Commission.").

Our sister courts of appeals have reached different conclusions on the point. Four courts of appeals have held that the immunity question, like the Article III question, must be resolved before the merits. *See United States v. Tex. Tech Univ.*, 171 F.3d 279, 285–86 (5th Cir. 1999); *In re Jackson*, 184 F.3d 1046, 1048 (9th Cir. 1999); *Martin v. Kansas*, 190 F.3d 1120, 1126 (10th Cir. 1999); *Seaborn v. Fla. Dep't of Corr.*, 143 F.3d 1405, 1407 (11th Cir. 1998). And six courts of appeals have held that the immunity question need not be addressed before the merits. *See In re Hechinger Inv. Co. of Del., Inc.*, 335 F.3d 243, 250 (3d Cir. 2003); *Strawser v. Atkins*, 290 F.3d 720, 730 (4th Cir. 2002); *Gordon v. City of Kansas City, Mo.*, 241 F.3d 997, 1005 n.7 (8th Cir. 2001); *United States ex rel. Long v. SCS Bus. & Tech. Inst., Inc.*, 173 F.3d 890, 898 (D.C. Cir. 1999); *Parella v. Ret. Bd. of the R.I. Employee Ret. Sys.*, 173 F.3d 46, 53–57 (1st Cir. 1999); *compare Kennedy v. Nat'l Juvenile Det. Ass'n*, 187 F.3d 690, 696 (7th Cir. 1999) *with Floyd v. Thompson*, 227 F.3d 1029, 1035 (7th Cir. 2000). Another circuit appears to have reached conflicting conclusions on the issue. *Compare Ret. Sys. of Ala. v. J.P. Morgan Chase & Co.*, 386 F.3d 419, 431 (2d Cir. 2004) *and Tyler v. Douglas*, 280 F.3d 116, 121 (2d Cir. 2001) (holding that the court may avoid the sovereign-immunity question) *with Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005) *and Hale v. Mann*, 219 F.3d 61, 66–67 (2d Cir. 2000) (holding that the court must address the sovereign-immunity question at the outset because it is jurisdictional).

While the trend in this area seems to favor giving federal courts discretion over the issue, we need not decide the point because there is a narrower ground for decision, one that (we suspect) will account for most situations in which the issue arises. The most salient difference between sovereign immunity and subject-matter jurisdiction is that the former may be altered by the parties' litigation conduct while the latter may not be. And it is just one party's litigation conduct—the sovereign's—that may alter the existence of federal-court jurisdiction. If it is true that sovereign immunity may be waived and if it is true that just one party (the State) may waive the defense, the State would seem to be free to express whatever preference it wishes about whether the defense is a threshold issue or one that arises only if the sovereign would otherwise lose on the merits. Surely a State that has authority to waive the broader question (of whether it is amenable to suit at all), *Alden*, 527 U.S. at 737, has authority to waive the narrower question (of whether a court must address a sovereign-immunity defense before the merits). Because sovereign immunity "grants the State a legal power to assert a sovereign immunity defense should it choose to do so," *Schacht*, 524 U.S. at 389, it is hard to say that this right has been diminished when a State "choose[s]" whether to express a mercenary interest only in prevailing (by any order of decision) or to express a "dignity" interest in immediately divesting the federal courts of jurisdiction over the dispute. *See Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) (stating that a critical "purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities"). If a State refuses to invoke its sovereign immunity as a threshold defense, usually by way of a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, it cannot credibly be heard to complain about the indignity of the federal courts resolving the merits of its case—and in its favor no less.

In a related setting, the Supreme Court has given States some control over the order in which federal courts address sovereign-immunity defenses. In *Puerto Rico Aqueduct and Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 147 (1993), the Court held "that States and state entities that claim to be 'arms of the State' may take advantage of the collateral order doctrine to appeal a district court order denying a claim of Eleventh Amendment immunity." But in doing so the Court did not *require* States immediately to appeal the denial of immunity. If a State may allow a district court to consider the merits before an appellate court considers its sovereign-immunity defense, it is difficult to see why a State should be prevented from allowing an appellate court to consider these same questions in the same order.

The defendants in this instance raised sovereign immunity as an "alternative" ground for rejecting Nair's claims. *See* Def. Br. at 23 ("The Eleventh Amendment bar is applicable on an alternative basis for dismissal of plaintiff's § 1983 claim."). Under these circumstances and under any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, we conclude that the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer. To our knowledge, no court of appeals to consider this question has held to the contrary, and several have explicitly or implicitly embraced this approach. *See Bowers v. NCAA*, 346 F.3d 402, 418 n.15 (3d Cir. 2003) ("Inasmuch as [the defendant] does not urge that we resolve the Eleventh Amendment questions before we decide the statutory contribution questions, conceptually, at least, we could hold that it has waived its Eleventh Amendment immunity to that very limited extent."); *Strawser*, 290 F.3d at 729 ("[T]he officials here argue the merits and rely upon [the Eleventh Amendment] defense only if it is necessary to prevent judgment against them on the merits.") (internal quotation marks omitted); *McClendon v. Ga. Dep't of Cmty. Health*, 261 F.3d 1252, 1258 (11th Cir. 2001) ("[T]he defendants are free to conditionally assert [the Eleventh Amendment] defense in order to allow a federal court to decide in their favor on the merits."); *SCS Bus. & Tech. Inst.*, 173 F.3d at 893 ("New York's litigation strategy—an Eleventh Amendment argument in the alternative—suggests that, at least, we are entitled to reverse the *Steel Co.* order. After all, *Steel Co.*'s rule is premised on a court's lack of power to reach the merits without establishing its jurisdiction. In the Eleventh Amendment context, where a court lacks power only if a state claims that it does, it is arguable that we have no obligation to decide the Eleventh Amendment issue first if the state does not demand that we do so.").

Because the defendants have raised sovereign immunity as an alternative defense, because the district court addressed only the merits and because the merits offer a more straightforward way for resolving this case, we bypass the sovereign-immunity question and proceed to Nair's claims under the First Amendment and Michigan's Whistleblowers' Protection Act. We leave for another day the question whether a federal court must decide the immunity question before the merits when a State raises it as a threshold defense.

III.

To establish a cognizable claim of retaliatory discharge in violation of the First (and Fourteenth) Amendment, Nair must demonstrate: "(1) that he was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused him to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of his constitutional rights." *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 715 (6th Cir. 2001). In establishing the first prong of the test—whether the speech is "protected"—a claimant must show that the speech involved "a matter of public concern," *Waters v. Churchill*, 511 U.S. 661, 668 (1994), as established by "the content, form, and context of [the] given statement," *Evans-Marshall v. Bd. of Educ.*, 428 F.3d 223, 229 (6th Cir. 2005) (internal quotation marks omitted). Whether Nair engaged in

protected speech is a question of law for the court. *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001).

One "context[ual]" clue for determining whether speech deals with "a matter of public concern" is whether the claimant is a public employee speaking in his official capacity about his employment. "[W]hen a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick v. Myers*, 461 U.S. 138, 147 (1983). In drawing a dichotomy between a public employee's speech "as a citizen" and his speech "as an employee," the Court has indicated that the latter is less likely to be treated as protected speech. *Connick*, 461 U.S. at 147; *see also id*. at 143 ("The repeated emphasis . . . on the right of a public employee 'as a citizen . . . ,' [is] not accidental."); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the [public employee], *as a citizen*, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting [ ] efficiency.") (emphasis added). Otherwise, "virtually every remark" within a government office "would plant the seed of a constitutional case," *Connick*, 461 U.S. at 149, and "government offices could not function if every employment decision became a constitutional matter," *id*. at 143.

As a public employee speaking about his own job responsibilities and hours, Nair has not shown that his speech addressed "a matter of public concern." The sole speech at issue, the parties agree, is Nair's November 8 letter to the board, which he wrote in his official capacity as a public employee, not in his capacity as a private citizen. JA 380 ("I need to make you . . . aware of some of my concerns *as the Medical Director*.") (emphasis added). The letter focuses on the reduction of Nair's responsibilities and hours, not those of anyone else employed by the Authority. ("[S]teadily and deliberately the responsibilities of the Medical Director have been curtailed and [ ] the position has been downgraded to a halftime level."). The interim requested remedy—the appointment of a committee to study his role—would directly affect Nair alone. And the ultimate remedy—the return of the Medical Director to a full-time position—would double just Nair's hours and his compensation. Even his concluding expression of concern about the legal and other obligations of the job is phrased personally rather than publicly, as he ends the letter by saying, "I have serious concerns about *my* legal, ethical and moral obligations." JA 381 (emphasis added).

Nor did the dialogue prompted by Nair's letter address public matters. Like Nair's letter, the response by the chairman of the board focuses on the Authority's administrative structure, the relationship of the medical and executive directors, and the medical director's limited responsibilities. It discusses patient care only to observe that the Authority's and medical director's role in directly providing it has ceased. No mention is made of public health. And no follow-up by Nair shows that the board chairman failed to grasp the point of his letter.

While it may not be fair to characterize Nair's letter and the underlying debate about the role of the medical director as solipsistic, it also would not be fair to characterize the letter as a public-spirited missive about health policy or patient care. Any connection the letter has with the public interest is incidental and arises only because Nair's job dealt with public health, which in a general sense concerns the public. As in *Gragg*, "while some of the issues raised in the letter . . . may have implications beyond [Nair], that fact alone does not make them issues of public concern. . . . If it were otherwise, an employee could characterize any internal dispute or grievance as relating to a matter of public concern." 289 F.3d at 967. *See also Rahn*, 31 F.3d at 414 ("In almost every public employee case brought under the First Amendment, the employee could contend that the public might wish to air [its] views on the goals of any public institution.").

Our cases resolving disputes between medical bodies and their employees confirm that Nair's speech does not fall on the protected side of the line. In *Rahn*, the plaintiff published a press release that criticized the hospital administrator and called for "a new, progressive, positive and capable Administrator." *Id.* at 411. A single sentence in the multi-page press release mentioned that newly promulgated work rules had "created a high absenteeism, possibly developing a patient endangerment situation." *Id.* at 410. This comment did not alter the letter's status as "an example of the quintessential employee beef" because the focus was "not on patient endangerment" but "on the employees' discontent." *Id.* at 413 (internal quotation marks and brackets omitted). By contrast, in *Rodgers v. Banks*, we analyzed an internal memorandum questioning the conversion of patient-care space into office space. 344 F.3d 587 (6th Cir. 2003). We noted that two-thirds of the memo focused on the needs of patients and ended with the statement that "the patient's needs . . . should be the most important factor." *Id.* at 600 (internal quotation marks omitted). Because the memo focused on patient care, a public concern, we granted the memo First Amendment protection. The statements in Nair's letter represent a far cry from the protected speech in *Rodgers* and are even less public spirited than the unprotected speech in *Rahn*.

Also unavailing is Nair's reliance on background information pre-dating this dispute. In August 2002, Nair points out, his predecessor expressed a concern to the board about the reduction of the medical director's hours from full-time to half-time. And a July 2002 accreditation review of the Authority, he adds, stated, "Documented proof that the Medical Director actively participates in management decisions that affect the scope and Quality of the delivery system's care and service providers was minimal. An interview with the Medical Director confirmed this observation." JA 372. To the extent Nair means to use this evidence to explain his motive for writing the letter to the board, that does not help his claim. "[O]ur opinions are clear that, consistent with the 'content' test of *Connick*, the pertinent question is not *why* the employee spoke, but *what* he said." *Farhat v. Jopke*, 370 F.3d 580, 591 (6th Cir. 2004); *see also Rodgers*, 344 F.3d at 600 (noting that "our duty is not to discern [the plaintiff's] underlying motive, but rather to evaluate her point as it is presented in the speech").

Nor do these two pieces of information otherwise advance the claim. That the previous medical director opposed reducing the position to half-time status shows only that medical directors in general, not the public at large, preferred the position to be full-time. That the accreditation review opined that the medical director showed only minimal participation in management decisions "that affect the scope and Quality of the delivery system's care and service providers" does not establish that the review board thought that the position should be full-time. Indeed, the comment more naturally supports the executive director's criticism of Nair that "more effort [was] needed" in taking "assertive medical leadership." JA 148. It bears adding that even though these two documents pre-dated Nair's November 8 letter to the board, he did not mention either of them in the letter. This claim accordingly fails as a matter of law.

IV.

Nair's claim under Michigan's Whistleblowers' Protection Act also fails as a matter of law. "An employer," the Act says, "shall not discharge . . . an employee . . . because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation" of the law. Mich. Comp. Laws § 15.362. To establish a prima facie case under the Act, Nair thus had to show that he had reported or imminently was going to report a violation of law to a public body. *Dolan v. Cont'l Airlines/Cont'l Express*, 563 N.W.2d 23, 26–27 (Mich. 1997); *see also id.* at 27 ("The act was intended to protect employees who alert the public to corruption or criminally irresponsible behavior in the conduct of government or large businesses.") (internal quotation marks omitted).

Nair cannot satisfy this requirement. As with the retaliation claim, the only evidence on which he relies is the November 8 letter to the board. Nowhere in the letter does he report a

violation or suspected violation of the law, and nowhere does he suggest that he is about to report such a violation.  That he concludes the letter by generically mentioning "*my* legal, ethical and moral obligations," JA 381 (emphasis added), does not show that the Authority has violated any law or that Nair intended to report any such violation.  This claim accordingly fails as well.

V.

For these reasons, we affirm.