*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0086p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

NATIONAL PARKS CONSERVATION ASSOCIATION,
INC.; SIERRA CLUB, INC.; and OUR CHILDREN'S
EARTH FOUNDATION,

     *Plaintiffs-Appellants,*

  *v.*

TENNESSEE VALLEY AUTHORITY,

     *Defendant-Appellee.*

No. 05-6329

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 01-00071—Thomas Varlan, District Judge.

Argued: September 18, 2006

Decided and Filed:  March 2, 2007

Before:  BATCHELDER and MOORE, Circuit Judges; COHN, District Judge.[*]

---

## COUNSEL

**ARGUED:** George E. Hays, San Francisco, California, for Appellants.  Frank H. Lancaster, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** George E. Hays, San Francisco, California, Wade V. Davies, RITCHIE, DILLARD & DAVIES, Knoxville, Tennessee, Michael A. Costa, San Francisco, California, William J. Moore III, LAW OFFICE OF WILLIAM J. MOORE III, Jacksonville, Florida, for Appellants.  Frank H. Lancaster, Harriet A. Cooper, Gregory R. Signer, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Appellee.  Andrew G. Frank, NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL, New York, New York, Louis E. Tosi, SHUMAKER, LOOP & KENDRICK, Toldeo, Ohio, Michael E. Born, Michael A. Snyder, SHUMAKER, LOOP & KENDRICK, Columbus, Ohio, for Amici Curiae.

  MOORE, J., delivered the opinion of the court, in which COHN, D. J., joined. BATCHELDER, J. (p. 10), delivered a separate dissenting opinion.

---

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge. Three environmental organizations brought this suit under the Clean Air Act's citizen-suit provisions, alleging that the Tennessee Valley Authority ("TVA") shirked its duty to obtain appropriate pollution limitations at a power plant it operates in Clinton, Tennessee. The district court granted summary judgment to TVA, concluding that the statute of limitations had run on the plaintiffs' claim for statutory penalties and that the concurrent-remedy rule barred their claim for injunctive relief. We conclude that the district court's ruling on the statute of limitations was in error, **REVERSE** its grant of summary judgment, and **REMAND** this case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Regulatory Framework

The primary purpose of the Clean Air Act ("CAA") is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). To achieve these goals, Congress instructed the United States Environmental Protection Agency ("EPA") to develop limits on the maximum concentrations of various pollutants allowable in different areas of the country, known as National Ambient Air Quality Standards ("NAAQS"). *Id.* § 7409. To enforce these limits, the CAA employs a system of cooperative federalism, requiring states to create plans "provid[ing] for implementation, maintenance, and enhancement" of the NAAQS. *Id.* § 7410(a)(1). Such a plan, called a "state implementation plan" ("SIP"), must:

● include enforceable emissions limitations and control measures, as well as compliance schedules, *id.* § 7410(a)(2)(A);

● provide for monitoring and analysis of air quality, *id.* § 7410(a)(2)(B);

● include an enforcement program, *id.* § 7410(a)(2)(C);

● regulate the construction and modification of sources of pollution, *id.*;

● prohibit emissions that will harm other states' efforts toward reducing air pollution, *id.* § 7410(a)(2)(D)(i);

● assure proper funding, staffing, and legal authority to carry out the SIP, *id.* § 7410(a)(2)(E); and

● require polluters to monitor the output of pollution and report the results to the state, *id.* § 7410(a)(2)(F).

After several years under this regulatory regime, Congress recognized that merely setting ceilings on emissions did not discourage existing polluters from increasing their pollution levels up to these limits, or encourage new polluters to minimize their emissions. To fix this defect, Congress amended the CAA in 1977 to include the "New Source Review" program. *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 628 (M.D.N.C. 2003), *aff'd,* 411 F.3d 539 (4th Cir. 2005), *cert. granted sub nom. Envtl. Def. v. Duke Energy Corp.*, 126 S. Ct. 2019 (2006). New Source Review featured "provisions for the protection of areas with relatively clean air [known as] Prevention of Significant Deterioration," or "PSD." *Duke Energy*, 278 F. Supp. 2d at 628.

Under PSD, each SIP must "contain emission limitations and such other measures as may be necessary . . . to prevent significant deterioration of air quality" by new sources of pollution or old sources that have undergone modifications. 42 U.S.C. § 7471.[1]  Because a key purpose of PSD is "to assure that any decision to permit increased air pollution . . . is made only after careful evaluation of all the consequences of such a decision," *id.* § 7470(5), polluters "are required to limit emissions to a 'baseline rate' and [to] obtain a permit before constructing or *modifying* facilities." *Duke Energy*, 278 F. Supp. at 628 (emphasis in original).  These permits are often referred to as "PSD permits," and they must both "set[] forth emission limitations for such facility," 42 U.S.C. § 7475(a)(1), and require that any proposed facility must be "subject to the best available control technology for each pollutant . . . emitted from, or which results from" the facility, *id.* § 7475(a)(4).[2] Additionally, PSD permits require the owner or operator of the plant to agree to ongoing monitoring "to determine the effect which emissions from any such facility may have, or is [sic] having, on air quality" in affected areas.  *Id.* § 7475(a)(7).

Tennessee's SIP provides for separate permits for construction and operation of sources of air pollution, *compare* TENN. COMP. R. & REGS. § 1200-3-9-.01 *with id.* § 1200-3-9-.02, but prohibits the issuance of an operating permit until all requirements of the construction permit are met, *id.* § 1200-3-9-.01(1)(e).   Tennessee's construction-permit regulations prohibit the commencement of "modification of an air contaminant source . . . without [the operator's] first having applied for and received . . . a construction permit for the construction or modification of such air contaminant source." *Id.* § 1200-3-9-.01(1)(a).  In turn, any construction or modification must comply with the emissions limitations expressed in "the approved construction permit application," and also with "all provisions of the regulations of [the Tennessee SIP], any applicable measures of the control strategy, and all provisions of the Tennessee Air Quality Act." *Id.* § 1200-3-9-.01(1)(d).  Plants must also operate in accordance with the limits expressed in construction permits because, as the deputy director of the Tennessee Air Pollution Control Division explained in deposition, the limitations included in construction permits are carried into operating permits, which contain no independent emissions limitations themselves.  Joint Appendix ("J.A.") at 625-26, 632 (Styke Depo. at 90-93, 119).

The construction permitting requirements of Tennessee's SIP also provide:

> In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emission limits and requirements to assure that these regulatory requirements are met.  The appropriate enforcement action shall be pursued to insure that ambient air quality standards and other regulatory requirements will be met.

TENN. COMP. R. & REGS. § 1200-3-9-.01(1)(e).  This provision places upon polluters an ongoing duty to ensure that they obtain the appropriate emissions limitations in their construction permits, even if they failed to do so before construction.  These limitations include Best Available Control Technology ("BACT"), *id.* § 1200-3-9-.01(4)(j), and other limitations flowing from the SIP's PSD provisions, *see id.* § 1200-3-9-.01(4).

---

[1] The PSD program applies only to regions that the EPA classifies as being in "attainment" of NAAQS or as "unclassifiable." 42 U.S.C. § 7471.  More stringent requirements apply to areas designated as being in "nonattainment" of NAAQS under 42 U.S.C. § 7407(d)(1)(A)(iii).

[2] Best available control technology, commonly referred to as "BACT," is not actually technology; instead, it is "an emission limitation based on the maximum degree of reduction" possible, taking into account a number of factors. 42 U.S.C. § 7479(3).

The Tennessee SIP's PSD program, however, does not apply to all modifications of emissions sources. Instead, the PSD regulations — a subset of the generally applicable construction regulations described above — apply only to new construction and to "major modifications" that would produce "a significant net emissions increase" of a pollutant. *Id.* § 1200-3-9-.01(4)(a)(1)-(2). Similar to the general construction regulations, the PSD program employs a permitting process that forbids any owner or operator to commence construction without the necessary approvals or to "construct[] or operate[] a source or modification" inconsistently with the applicable PSD permit. *Id.* § 1200-3-9-.01(4)(a)(3). And like the general construction regulations, the emissions limitations established in a PSD permit determine the emissions limitations in an operating permit. As the Tennessee Air Pollution Control Division's deputy director put it, "The PSD permit establishes an initial limit which would be carried over to a separate operating permit and subsequent operating permits until such time that a recision [of the PSD permit] occurred." J.A. at 635 (Styke Depo. at 131). Further, Tennessee's PSD program requires that subject sources "shall apply best available control technology" and "shall meet each applicable emissions limitation under . . . the State Implementation Plan." Tenn. Comp. R. & Regs. § 1200-3-9-.01(4)(j).

## B.  Relevant Factual Background

TVA, a corporation created by statute with a board of directors appointed by the President, 16 U.S.C. §§ 831-831a, owns and operates the Bull Run power plant in Clinton, Tennessee. In 1988, TVA performed a "major overhaul" of the boiler used to produce electricity, in which it replaced approximately 58,000 feet of tubing inside the boiler. Joint Appendix ("J.A.") at 644-45. This quantity amounts to about 26.5% of the total tubing inside the boiler. TVA admits that it never applied for, or obtained, a PSD permit under the Tennessee SIP's PSD regulations, and does not indicate whether it applied for any other permit before the project.

Following an investigation, in November 1999, the EPA issued an administrative compliance order ("ACO") concluding that the boiler overhaul at Bull Run constituted a modification of the plant, and therefore triggered the PSD provisions of the Tennessee SIP. *TVA v. Whitman*, 336 F.3d 1236, 1244 (11th Cir. 2003), *cert. denied,* 541 U.S. 1030 (2004). The ACO further required TVA to obtain all required permits and enter into a compliance agreement with the EPA. *Id.*

After extensive negotiations between TVA and the EPA and various amendments of the ACO, the EPA "decided to 'reconsider' the ACO by 'adjudicating' the issue of whether TVA had violated the CAA" before the EPA's Environmental Appeals Board ("EAB"), which substantially "affirmed" the ACO. *Id.* at 1245-46. The EPA chose to pursue the matter in front of the EAB rather than file an enforcement action because it believed that TVA could not be sued in federal court. *Id.* at 1239. TVA petitioned for review of the EAB's decision in the Eleventh Circuit, which ultimately concluded that critical aspects of the ACO procedure violated due process. *Id.* at 1256-60. For this reason, the court further concluded that ACOs lack legal consequence and cannot constitute final agency action. Accordingly, the court held that it lacked jurisdiction over the dispute, and that the EPA must prove violations of the CAA in an enforcement action brought in U.S. district court rather than through its ACO procedure. *Id.* at 1260. Apparently still clinging to its belief that it could not sue TVA in federal court, the EPA has not pursued such an action.

On February 13, 2001, Plaintiffs National Parks Conservation Association ("National Parks") and Sierra Club filed their original complaint. They amended the complaint to add Our Children's Earth Foundation ("OCE") as a plaintiff in November 2004. The essence of their complaint is that TVA violated the CAA and the Tennessee SIP by failing to obtain a PSD permit before it modified the Bull Run plant in 1988, and by continuing to operate the plant without such a permit, without having performed the required air-quality analysis, and without applying BACT. The result of these violations, according to the plaintiffs, is that TVA has evaded the appropriate emissions limitations

of sulfur dioxide ($SO_2$) and nitrogen oxides ($NO_x$).  To rectify these alleged wrongdoings, they seek declaratory relief, an injunction, and civil penalties to be paid to the EPA.

## C.  Procedural History

After National Parks and Sierra Club established organizational standing, the district court stayed all proceedings in April 2002 pending resolution of related litigation in the Eleventh Circuit. *See TVA v. United States Envtl. Prot. Agency*, 278 F.3d 1184 (11th Cir. 2002), *op. withdrawn in part*, *Whitman*, 336 F.3d 1236.  The district court lifted the stay in July 2004, and the following month, TVA moved for summary judgment on its statute of limitations defense.  Before ruling on TVA's motion, the district court granted the plaintiffs leave to file an amended complaint, which they did in November 2004.

On December 9, 2004, the parties jointly moved the district court to decide TVA's statute of limitations defense before ruling on its sovereign immunity defense.  The district court granted this motion.

After a hearing on TVA's motion for summary judgment, the district court granted the motion and dismissed the plaintiffs' complaint with prejudice.  In its opinion, the district court concluded (1) that the plaintiffs did not establish a continuing violation of the CAA and the Tennessee SIP, (2) that the plaintiffs' cause of action accrued in 1988, and (3) because the statute of limitations on the plaintiffs' claim for civil penalties had run, the concurrent-remedy rule barred the plaintiffs' claim for injunctive relief.  The plaintiffs moved for reconsideration under Federal Rule of Civil Procedure 59(e) and for leave to amend under Rule 15.  On July 22, 2005, the district court denied both motions.  The plaintiffs now appeal.

## II.  STANDARD OF REVIEW

We review de novo a district court's order granting summary judgment.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).  We will affirm a grant of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In reviewing the district court's decision to grant summary judgment, we must view all evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.  ANALYSIS

## A.  Statute of Limitations

A five-year statute of limitations applies to any action "for the enforcement of any civil fine, penalty, or forfeiture."  28 U.S.C. § 2462.  The CAA provides for civil penalties of $25,000 per day per violation, 42 U.S.C. § 7413(b),[3] and the plaintiffs' first amended complaint seeks such penalties.  The plaintiffs now argue that notwithstanding their request for civil penalties, this is not a case "for the enforcement of" such penalties because TVA is immune from liability for civil penalties.

---

[3] Section 7413(b) explicitly authorizes only the EPA Administrator "to assess and recover a civil penalty" for a violation of "any requirement or prohibition of an applicable implementation plan or permit."  However, the citizen-suit provision authorizes "any person" to pursue a CAA action, and authorizes the district court "to apply any appropriate civil penalties."  42 U.S.C. § 7604(a).

The EPA raised the penalties to $27,500 per day for violations committed between January 30, 1997, and March 15, 2004, and to $32,500 per day for violations committed thereafter.  40 C.F.R. §§ 19.2, 19.4.

We recently concluded that "under any circumstances in which the State (or the United States) declines to raise sovereign immunity as a threshold defense, . . . the federal courts have discretion to address the sovereign-immunity defense and the merits in whichever order they prefer." *Nair v. Oakland County Cmty. Mental Health Auth.*, 443 F.3d 469, 477 (6th Cir. 2006). Here, TVA did not raise sovereign immunity "as a threshold defense," e.g., by way of motion to dismiss. Instead, it (and, for that matter, the plaintiffs) requested that the district court reserve a decision on TVA's immunity until after the court addressed TVA's statute of limitations defense. The district court did so, and because it concluded that the plaintiffs' claims were time-barred, never reached the immunity issue, which therefore is not presently before us. Under *Nair*, the district court's reserving adjudication of TVA's immunity defense was within its discretion. Accordingly, the plaintiffs' request for civil penalties remains part of the operative complaint, and their suit is one "for the enforcement of" civil penalties. We hold that § 2462's five-year statute of limitations applies.

## B. Continuing Violation

Because § 2462 applies, for their suit to be timely, the plaintiffs must identify a wrongful act that took place within five years of their filing this suit. TVA argues, and the district court concluded, that the CAA and SIP prohibit only *construction* without a permit. The only construction here at issue (TVA's replacing tubing in the Bull Run plant's boiler) took place in 1988,[4] so according to TVA, the statute of limitations for any violation premised upon that construction ran in 1993. The plaintiffs counter that TVA's subsequent and continuing failures (1) to apply BACT and (2) to obtain a construction permit containing emissions limitations under the Tennessee SIP's PSD provisions are actionable. We agree.

Both parties, as well as the district court, framed this dispute as one regarding whether the plaintiffs have alleged a "continuing violation" of the CAA. Under the continuing-violation doctrine, the court can consider as timely all relevant violations "including those that would otherwise be time[-]barred." *Sharpe v. Cureton*, 319 F.3d 259, 267 (6th Cir.) (internal quotation marks omitted), *cert. denied*, 540 U.S. 876 (2003). *See also Gandy v. Sullivan County*, 24 F.3d 861, 864 (6th Cir. 1994) ("The doctrine . . . may allow a court to impose liability on [a defendant] for acts committed outside the limitations period.").

We previously have said that "[c]ourts have been extremely reluctant to apply this doctrine outside the context of Title VII." *LRL Props. v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1105 n.3 (6th Cir. 1995). Since then, we nonetheless have applied the continuing-violation doctrine to claims for deprivations of civil rights. *See, e.g.*, *Tolbert v. Ohio Dep't of Transp.*, 172 F.3d 934 (6th Cir. 1999) (applying continuing-violation theory in action brought under 42 U.S.C. § 1983 alleging racially discriminatory allocation of highway sound barriers); *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) (considering continuing-violation doctrine in case involving takings claim and due process claims for deprivations of liberty and property). No opinion has articulated a principled reason why the continuing-violation doctrine should be limited to claims for deprivations of civil rights and employment discrimination, and other courts have considered the continuing-violation doctrine in environmental disputes. *See, e.g.*, *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619 (M.D.N.C. 2003) (concluding violations of the North and South Carolina SIPs' PSD provisions are continuing violations); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 660-63 (W.D.N.Y. 2003) (concluding violations of federal PSD regulations are not continuing violations); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 442-44 (D. Md. 2001) (concluding violations of Maryland PSD regulations are not continuing violations).

---

[4] Under 42 U.S.C. § 7479(2)(C), "construction" includes modification.

We need not decide whether the continuing-violation doctrine applies in environmental suits, as we conclude this case presents a series of discrete violations rather than a single violation that may or may not be "continuing" in nature. Courts have long distinguished continuing violations, which toll the applicable statutes of limitations, from repetitive discrete violations, which constitute independently actionable individual causes of action. For instance, in *Gandy*, we noted that each check based on a discriminatory method of calculating pay constitutes a separate violation of the Equal Pay Act, and we concluded that the plaintiff was entitled to a recovery based on any such checks received within the limitations period. 24 F.3d at 863-64. We further recognized, "Although [the cause of action is] 'continuing in nature,' invocation of the continuing violations doctrine is not necessary since plaintiffs . . . are not attempting to file an otherwise untimely action and are not attempting collection of damages for conduct outside the limitations period." *Id*. at 864.

Additionally, in *Knight v. Columbus*, 19 F.3d 579 (11th Cir.), *cert. denied*, 513 U.S. 929 (1994), the Eleventh Circuit noted, "The term 'continuing violation' suggests that the original violation . . . is somehow the source of the [plaintiffs'] present ability to recover." *Id*. at 582. The *Knight* court continued, "The term 'continuing violation' also implies that there is but one incessant violation and that the plaintiffs should be able to recover for the entire duration of the violation, without regard to the fact that it began outside the statute of limitations." *Id*. There, the plaintiffs sought recovery under the Fair Labor Standards Act ("FLSA") for the city's failure to pay them for overtime they worked. The city argued that their claims were time-barred because the decision to classify the employees as exempt from the FLSA's overtime provisions occurred outside the limitations period. Noting that the conduct prohibited by the FLSA is failing to *pay* overtime, the court concluded that each paycheck that did not compensate the plaintiffs for overtime constituted a new violation. Accordingly, the court recognized that the plaintiffs did not assert a single "continuing violation," but instead sought recovery for "a series of repeated violations of an identical nature" in which "each violation gives rise to a new cause of action," *id*., and held that the plaintiffs were entitled to recover for each such violation that occurred within the limitations period.

Similarly, in the context of Title VII discrimination charges filed with the EEOC, the Supreme Court has instructed that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Accordingly, the Court held that a plaintiff may recover for all discrete acts of discrimination that occur within the limitations period. *Id*. at 105, 114. *See Sharpe*, 319 F.3d at 267-68 (applying *Morgan* to claims under 42 U.S.C. § 1983).

Notably, in each of these cases, the court's analysis began with a careful examination of the specific conduct prohibited by the statute at issue.[5] In *Gandy*, it was paying female employees unequally for equal work; in *Knight*, the prohibited conduct was failing to pay time-and-a-half for overtime hours worked; and in *Morgan*, it was discrete acts or occurrences of discrimination, such as suspension or termination. We follow these examples, and turn now to the precise conduct prohibited by the CAA.

## C. Actionable Conduct

The CAA's citizen-suit provision authorizes the plaintiffs to sue anyone "who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). An "emission standard or limitation under this chapter" includes "any . . . standard, limitation, or schedule established under any permit issued . . . under any applicable State implementation plan approved

---

[5] The same is true for cases analyzed as potential continuing violations under *Tolbert v. Ohio Department of Transportation*, 172 F.3d 934, 941 (6th Cir. 1999), because the first prong of the test articulated in *Tolbert* requires the court to identify the "wrongful conduct" alleged in the complaint.

by the [EPA] Administrator, any permit term or condition, *and any requirement to obtain a permit as a condition of operations.*" *Id.* § 7604(f)(4) (emphasis added). So defined, the provisions of the particular state's SIP determine what conduct is actionable under the CAA. For the plaintiffs' claims to be timely, then, they must identify (1) a standard or limitation that TVA violated or (2) any required permit that it failed to obtain, within five years of bringing this suit.

### 1. Failure to Apply BACT

The district court never determined whether the 1988 project at Bull Run constitutes a "major modification," as is required for the PSD regulations to apply to the project. *See* TENN. COMP. R. & REGS. 1200-3-9-.01(4)(c). Accordingly, that issue is not before us. Because on summary judgment we are required to view all evidence in the light most favorable to the opponents of the motion, here the plaintiffs, we assume without deciding that the project constitutes a major modification and that the PSD requirements of Tennessee's SIP apply.

One provision of the PSD regulations states, "A major modification *shall apply* best available control technology for any pollutant for which it would result in a significant net emissions increase at the source." *Id.* § 1200-3-9-.01(4)(j)(3) (emphasis added). This provision, by its own terms, creates an ongoing obligation to apply BACT, regardless of what terms a preconstruction permit may or may not contain. Even if TVA had obtained a construction permit that did not require BACT, such an approval "shall not relieve any owner or operator of the responsibility to comply fully with applicable provisions under [the Tennessee SIP] and any other requirements under local, State, or Federal law." *Id.* § 1200-3-9-.01(4)(a)(5). Because the SIP requires that modified sources apply BACT, TVA may not rely on any preconstruction approval to justify its post-construction failure to comply with this provision (again, assuming that the Bull Run overhaul was a "major modification").

Under § 1200-3-9-.01(4)(j), failing to apply BACT is actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions. The violations that plaintiffs allege thus occurred both inside and outside the limitations period. We hold that insofar as the plaintiffs seek assessment of penalties for violations occurring prior to February 13, 1996, their actions are time-barred. Insofar as they seek penalties for later violations, their claims are timely.

### 2. Failure To Obtain Appropriate Construction Permit After Construction

The plaintiffs also show that TVA violated its ongoing requirement to obtain the appropriate construction permit after completing construction. Tennessee's SIP forbids "the construction . . . or the modification of an air contaminant source" unless the owner or operator first "applie[s] for and receive[s] from the Technical Secretary a construction permit for the construction or modification of such air contaminant source." TENN. COMP. R. & REGS. § 1200-3-9-.01(1)(a). This provision appears to support TVA's position — i.e., that the SIP prohibits only *construction* without a permit.

However, under the Tennessee SIP, the obligation to obtain an appropriate permit is ongoing, and applies even to those sources that did not obtain the appropriate permits before construction: "In the case where a source or modification was constructed without first obtaining a construction permit, a construction permit may be issued to the source or modification to establish as conditions of the permit, the necessary emissions limits and requirements to assure that these regulatory requirements are met." *Id.* § 1200-3-9-.01(1)(e). In other words, while § 1200-3-9-.01(1)(a) contains the Tennessee SIP's *pre*construction permitting requirement, § 1200-3-9-.01(1)(e) establishes that the duty to obtain a construction permit containing the proper emissions limits is ongoing, even *post*-construction.

Despite § 1200-3-9-.01(1)(e)'s seemingly permissive language ("may be issued"), the provision's following sentence reveals that obtaining a permit guaranteeing "that ambient air quality standards and other regulatory requirements will be met" is mandatory, as it requires that "[t]he appropriate enforcement action *shall* be pursued." *Id.* (emphasis added). The PSD provisions of Tennessee's SIP, *id.* § 1200-3-9-.01(4), are among these "other regulatory requirements."

TVA admits that it never received a permit containing emissions limitations under the Tennessee SIP's PSD provisions. Consequently, TVA has been, and remains, in violation of § 1200-3-9-.01(1)(e)'s requirement that it obtain a permit containing "the necessary emission limits and requirements to ensure that [the SIP's] regulatory requirements are met."[6] Like the alleged failure to apply BACT, this alleged violation manifests itself each day the plan operates. Accordingly, we hold that the violations predating February 13, 1996 are time-barred, while the remaining violations are not.

## D. Concurrent-Remedy Rule

Because we conclude that the plaintiffs' claims for civil penalties are timely under 28 U.S.C. § 2462 insofar as they relate to violations occurring within five years of February 13, 2001, we need not address the district court's application of the concurrent-remedy rule.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the plaintiffs' claims for civil penalties are timely insofar as they relate to violations that occurred within five years of the date they filed their initial complaint. Accordingly, we **REVERSE** the district court's decision to the contrary, and **REMAND** for further proceedings consistent with this opinion.

---

[6] This, of course, assumes that the Bull Run project was a major modification to which the PSD regulations apply. On remand, the district court may determine whether the project constituted a major modification under TENN. COMP. R. & REGS. § 1200-3-9-.01(4)(b)(2), including whether the project "result[ed] in a significant net emissions increase of any pollutant subject to regulation."

—————————

**DISSENT**

—————————

ALICE M. BATCHELDER, Circuit Judge. I respectfully dissent because I do not agree that this case involves a "series of discrete violations." I believe this case involves, at most, a single violation that occurred in 1988, and therefore, its statute of limitations expired five years later. I would affirm the district court.

Under Tennessee law, the TVA was required to obtain two separate permits: a construction permit, *see* Tenn. Comp. R. & Regs. 1200-3-9.01; and an operating permit, *see id*. at .02. The TVA has an operating permit and no one in the present case has alleged any violation of it. The claim here is that because the TVA failed to obtain a construction permit prior to its plant modification in 1988 (or any time since), it is emitting pollutants above the allowable BACT levels. Based on my reading of the law, I would hold that, even if this claim is true, this condition constitutes a series of discrete *harms* and not a series of discrete *violations*.

By way of example, suppose I contracted with a carpenter to repair the roof of my home. If he failed to do so, then he would have breached the contract – a single violation. Under this scenario, I suffer a new *harm* every time it rains, i.e., every time water comes into my living room through the faulty roof. The carpenter does not, however, breach the contract anew every time it rains; that is, the carpenter does not commit a new and discrete *violation*. I believe the same reasoning applies to the present case, and this reasoning is consistent with *Tolbert v. Ohio Department of Transportation*, 172 F.3d 934, 940 (6th Cir. 1999) (distinguishing "continuing ill effects" from "continuing unlawful acts"). To complete the present example: if a *violation* (rather than merely a new harm) occurs each time it rains, then the corollary is that it must rain in order for a violation to occur, and under such a theory, I would not be able to sue the carpenter for breaching the contract to repair my roof until after I had suffered through at least one rain storm. In truth, however, I could sue the carpenter as soon as I became aware of his breach of the contract; I need not wait for it to rain, and if I were to wait, I would likely be held accountable for such a delay.

Returning to the present case, let us assume, *arguendo*, that the TVA was in fact required to obtain a construction permit before beginning its modification of the Bull Run plant in 1988. By failing to do so, it committed a violation. Under this scenario, the plaintiffs may have suffered a new *harm* every time thereafter that the plant was in operation (i.e., emitting pollutants above the BACT levels), but just as with the carpenter, the TVA did not violate the *construction* permit requirement anew every time the plant was operating. That is, the TVA did not commit a new and discrete *violation* of the construction permit requirement every time it operated the plant, particularly if the TVA was in compliance with its *operating* permit. To complete this reasoning; if a *violation* (rather than merely a harm) occurs each time the plant operates, then the corollary is that the plant must operate in order for a violation to occur, and under such a theory, there would be no violation for failing to obtain a construction permit until after the TVA had operated the plant at least one time. While that is an apt description of an *operating* permit, it is an inapt description of a *construction* permit.

Because I find this "discrete violations" approach unsupported by law or reason, I must respectfully dissent. This seems to me to be the plaintiffs' strained attempt to circumvent their failure to act within the statute of limitations. If they have a claim that the TVA is violating its operating permit by emitting pollutants in excess of BACT levels, then they should file that claim. The present claim, however, expired in 1993. I would affirm.